# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 23-198** |
| **v.** | : | **DATE FILED: _____** |
| **JOSEPH LAFORTE** | : | **VIOLATIONS:** |
| a/k/a "Joe Mack," | | |
| a/k/a "Joe Macki," | : | **18 U.S.C. § 1962(d) (racketeering conspiracy – 1 count)** |
| a/k/a "Joe Mackie," | | |
| a/k/a "Joe McElhone," | : | **18 U.S.C. § 1343 (wire fraud – 19 counts)** |
| **JOSEPH COLE BARLETA** | | **15 U.S.C. §§ 78j(b), 78ff and 17** |
| a/k/a "Joe Cole," | : | **C.F.R. § 240.10b-5 (securities fraud – 1 count)** |
| **JAMES LAFORTE** | | |
| a/k/a "Jimmy Schillaci" | : | **18 U.S.C. § 894(a) (conspiracy to use extortionate means to collect an extension of credit – 1 count)** |
| | : | **18 U.S.C. § 894(a) (use of extortionate means to collect an extension of credit – 7 counts)** |
| | : | **26 U.S.C. § 7201 (tax evasion – 1 count)** |
| | : | **26 U.S.C. § 7206(1) (false returns – 2 counts)** |
| | : | **26 U.S.C. § 7202 (failure to collect and pay over tax – 12 counts)** |
| | : | **18 U.S.C. 1623 (perjury – 4 counts)** |
| | : | **18 U.S.C. § 1512(c)(2) (obstruction – 2 counts)** |
| | : | **18 U.S.C. § 371 (conspiracy to obstruct justice – 1 count)** |
| | : | **18 U.S.C. § 1503 (obstruction – 1 count)** |
| | | **18 U.S.C. § 1505 (obstruction – 1 count)** |
| | : | **18 U.S.C. § 1512(a)(2)(A), (B)(i) (tampering – 3 counts)** |
| | : | **18 U.S.C. § 1513(b)(1) (retaliation – 3 counts)** |
| | : | **18 U.S.C. § 2 (aiding and abetting) Notices of forfeiture** |

## <u>AMENDED SECOND SUPERSEDING INDICTMENT</u>

<u>**COUNT ONE**</u>
(Racketeering Conspiracy)

**THE GRAND JURY CHARGES THAT:**

<u>**The Enterprise**</u>

1.      At all times relevant to this second superseding indictment, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

and other persons and entities known and unknown to the grand jury, including Complete

Business Solutions Group, Inc., d/b/a Par Funding ("Par Funding"), charged elsewhere, and its

affiliate companies defined below, were members and associates of a criminal organization that

operated in the Eastern District of Pennsylvania, and elsewhere, which engaged in various types

of criminal activity, including but not limited to securities fraud, wire fraud, extortionate

collection of debt, perjury, obstruction of justice, and witness tampering, and witness retaliation.

2.      This criminal organization, including its leaders, members, and associates,

constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a

group of individuals and entities associated in fact.  This enterprise was engaged in, and its

activities affected, interstate and foreign commerce.  The enterprise constituted an ongoing

organization whose members functioned as a continuing unit for a common purpose of achieving

the objectives of the enterprise.

**Relevant Entities**

3.     Par Funding was formed by defendant JOSEPH LAFORTE in or around October 2011, in the name of his wife, Lisa McElhone, charged elsewhere. Par Funding was incorporated in Delaware.

a.     Par Funding operated through and in conjunction with several affiliated companies, including Contract Financing Solutions, Inc. ("CFS"), Fast Advance Funding, LLC ("FAF"), and Capital Source 2000, Inc. (collectively, the "Par Funding affiliates"). Par Funding and the Par Funding affiliates shared common ownership and/or control, and funds were frequently transferred back and forth between these entities.

b.     Par Funding and the Par Funding affiliates were in the business of funding businesses ("merchant-customers") through short-term financing transactions, which it held out as merchant cash advances ("MCAs"). In these transactions, Par Funding purported to purchase these merchant-customers' future receivables at a discounted price. The purchase price was given to the merchant-customer—typically in a lump sum—with the expectation that the merchant-customer would use the funds to operate its business. The merchant-customer agreed to repay Par Funding the purchase price advanced to it plus an additional amount, which was typically 30% or more of the purchase price. Par Funding generally collected these deferred repayments in installments through automatic daily or weekly debits from the merchant-customer's bank accounts.

c.     Par Funding frequently entered "reload" agreements with merchant-customers, which were essentially refinancings of pre-existing MCAs. In a reload, Par

Funding's new, larger advance typically repaid the amount due on the original advance and provided some additional funding to the merchant-customer.

        d.       In order to fund these MCAs, Par Funding raised capital through the solicitation of numerous investors and the issuance of promissory notes. In its early years, the company raised this capital directly, but in or about 2018, Par Funding began to raise capital indirectly through private investment vehicles ("Agent Funds"), which relied in part on information provided and promotional materials prepared by Par Funding.

        4.       Victim Business No. 1 was a barbershop business located in Philadelphia, Pennsylvania, owned by Extortion Victim No. 1. On or about July 22, 2014, FAF entered into an MCA agreement with, and provided funding to, Victim Business No. 1. Victim Business No. 1 subsequently entered into additional agreements with FAF and Par Funding, which increased Victim Business No. 1's debt to Par Funding.

        5.       Victim Business No. 2 was a technology company located in Los Angeles, California, co-owned by Extortion Victims Nos. 2 and 3. In or about late November 2015, Par Funding entered into an MCA agreement with, and provided funding to, Victim Business No. 2. Victim Business No. 2 subsequently entered into additional agreements, which increased Victim Business No. 2's debt to Par Funding by millions of dollars.

        6.       Victim Business No. 3 was a retail hardware business located in Lancaster, Pennsylvania, owned by Extortion Victim No. 4. On or about October 7, 2016, Par funding entered into an MCA agreement with, and provided funding to, Victim Business No. 3. Victim Business No. 3 subsequently entered into additional agreements, which increased Victim Business No. 3's debt to Par Funding.

7. Victim Business No. 4 was a real estate company located in Miami, Florida, owned by Extortion Victim No. 5. On or about October 11, 2017, Par Funding entered into an MCA agreement with, and provided funding to, Victim Business No. 4. Victim Business No. 4 subsequently entered into additional agreements, which increased Victim Business No. 4's debt to Par Funding by millions of dollars.

8. Victim Business No. 5 was a manufacturing company located in Columbia, Maryland, owned by Extortion Victim No. 6. In or about February 2018, Par Funding entered into an MCA agreement with, and provided funding to, Victim Business No. 5. Victim Business No. 5 subsequently entered into additional agreements, which increased Victim Business No. 5's debt to Par Funding by tens of millions of dollars.

9. Victim Business No. 6 was an electrician business located on Long Island, New York, owned by Extortion Victim No. 8. On or about January 5, 2018, Par Funding entered into an MCA agreement with, and provided funding to, Victim Business No. 6. Victim Business No. 6 subsequently entered into additional agreements, which increased Victim Business No. 6's debt to Par Funding by hundreds of thousands of dollars.

10. Victim Business No. 7 was a residential and commercial solar systems business located in Cherry Hill, New Jersey, owned in part by Extortion Victim No. 10. On or about April 23, 2018, Par Funding entered into an MCA agreement with, and provided funding to, Victim Business No. 7. Victim Business No. 7 subsequently entered into additional agreements, which increased Victim Business No. 7's debt to Par Funding by millions of dollars.

11. Victim Business No. 8 was a business located in Miami, Florida, owned by Extortion Victim No. 11. On or about December 8, 2018, Par Funding entered into an MCA

agreement with, and provided funding to, Victim Business No. 8.  Victim Business No. 8

subsequently entered into additional agreements, which increased Victim Business No. 8's debt

to Par Funding by millions of dollars.

12.     Victim Business No. 9 was a business located in Vermont, owned by

Extortion Victim No. 12.  In or about March 2015, Par Funding entered into an MCA agreement

with, and provided funding to, Victim Business No. 9.  Victim Business No. 9 subsequently

entered into additional agreements, which increased Victim Business No. 9's debt to Par Funding

by millions of dollars.

13.     The United States Securities and Exchange Commission (the "SEC") was

an independent agency of the United States that was charged by law with protecting investors by

regulating and monitoring, among other things, the purchase and sale of securities.  Federal

securities laws prohibited fraud in connection with the purchase and sale of securities, including

making an untrue statement of material fact or omitting to state a material fact in the information

provided to investors.  The promissory notes that Par Funding and the Agent Funds issued were

securities.

14.     On or about July 24, 2020, the SEC filed a civil complaint in the United

States District Court for the Southern District of Florida captioned *SEC v. Complete Business

Solutions Group*, *et al*., 9:20-cv-81205-RAR (S.D. Fl.) (the "SEC lawsuit") as part of an SEC

enforcement action.  The defendants in the SEC lawsuit included defendants JOSEPH

LAFORTE and JOSEPH COLE BARLETA, a/k/a Joe Cole ("JOE COLE"), along with Lisa

McElhone, Par Funding, Perry Abbonizio, charged elsewhere, and Person No. 1.  On or about

July 27, 2020, the Florida district court in the SEC lawsuit appointed attorney R.S. of

Stumphauzer Foslid Sloman Ross & Kolaya, PLLC as the receiver (the "Receiver") over Par Funding and several of the Par Funding affiliates. R.S. practices law in Miami, Florida.

15. On or about July 31, 2020, the Florida district court granted an order permitting G.A., a partner at the law firm Pietragallo Gordon Alfano Bosick & Raspanti, LLP, to enter his appearance on behalf of the Receiver for Par Funding. The office of the law firm Pietragallo Gordon Alfano Bosick & Raspanti, LLP, is located at 1818 Market Street, Philadelphia, Pennsylvania.

## Purposes of the Enterprise

16. The purposes of the enterprise, including its members and associates, included but were not limited to the following:

    a. to generate money for its leadership, members, and associates through the commission of various criminal acts such as securities fraud, wire fraud, the extortionate collection of debt, obstruction of justice, and witness retaliation;

    b. to conceal from investors, auditors, the government, and law enforcement that its members were self-dealing and enriching themselves to the detriment of Par Funding's investors;

    c. to conceal defendant JOSEPH LAFORTE's role as the functional Chief Executive Officer of Par Funding, as well as his criminal history, from investors, customers, auditors, the government, and law enforcement, including through misrepresentations, false statements, and other means;

    d. to use extortionate means, including threats of violence, to collect money owed to Par Funding and the Par Funding affiliates by their merchant-customers;

e.      to maintain control over Par Funding after Par Funding was put under the control of a court-appointed Receiver, including by acts of obstruction and witness retaliation through violence and threats of violence which were intended to frustrate and interfere with the Receiver's efforts to control Par Funding and to minimize the financial exposure of defendant JOSEPH LAFORTE and his wife, Lisa McElhone, in order to retain more of the illicit proceeds; and

f.      to protect the members and associates of the enterprise from detection, apprehension, and prosecution by law enforcement.

### Structure of the Enterprise

17.     Defendant JOSEPH LAFORTE together with defendant JOE COLE and Lisa McElhone formed the enterprise in or about 2011 for the principal purpose of controlling and exploiting Par Funding and defrauding its investors for their own personal financial gain. From in or about 2011 until on or about May 23, 2023, when defendant JOSEPH LAFORTE was arrested and incarcerated on the superseding indictment, the enterprise expanded to include defendant JAMES LAFORTE, Renato Gioe, charged elsewhere, Perry Abbonizio, charged elsewhere, Person No. 1, and Person No. 2, among others.

18.     Defendant JOSEPH LAFORTE was the leader of the enterprise, and he was consulted on, and had the final say over, all major decisions.  Defendant JOE COLE served as the second-in-command, and he handled the day-to-day logistics and administration of much of the enterprise's financial activities.  Defendant JAMES LAFORTE and Perry Abbonizio functioned as supervisors who directed the activities of various employees, agents, and contractors of Par Funding and the Par Funding affiliates.  Defendant JAMES LAFORTE was

principally tasked with finding potential merchant-customers for Par Funding and the Par Funding affiliates, and Abbonizio was principally tasked with finding potential investors and disseminating false and fraudulent statements and omissions generated by the enterprise. Person No. 1 was the head and manager of an affiliated Agent Fund who disseminated the false and fraudulent statements and omissions generated by the enterprise, and who directed others in his control to do the same. Person No. 2 was another supervisor who was tasked with overseeing various schemes of self-dealing perpetuated by the enterprise to the detriment of Par Funding and its investors. Renato Gioe, and at times defendant JAMES LAFORTE, functioned as enforcers who protected the enterprise's interests including by threatening delinquent merchant-customers and, in the case of defendant JAMES LAFORTE, using violence and threats of violence to commit obstruction of justice and related crimes. The false statements and schemes of self-dealing were further perpetuated by other members and associates of the enterprise.

19.     The enterprise continued to function in this manner after the Receiver took control of Par Funding and many of the Par Funding affiliates. That is, defendant JOSEPH LAFORTE continued to function as the leader of the enterprise, defendant JOE COLE continued to serve as the second-in-command, and defendant JAMES LAFORTE, Perry Abbonizio, Person No. 1, and Person No. 2 continued to function as supervisors who oversaw and administered the enterprise's efforts to regain control of Par Funding and to frustrate the Receiver's efforts to identify and collect assets for the benefit of Par Funding's defrauded investors.

**Roles of the Defendants and Members and Associates of the Enterprise**

**Defendant JOSEPH LAFORTE**

20.     On or about October 4, 2006, defendant JOSEPH LAFORTE was convicted of state charges in New York for grand larceny and money laundering, and on November 8, 2007, he was sentenced to three to ten years in prison and ordered to pay restitution in the amount of approximately $14 million.  In or about 2009, defendant JOSEPH LAFORTE pled guilty to federal criminal charges in the District of New Jersey for conspiracy to operate an illegal gambling business.  Information regarding these convictions was available on the internet under the name "Joseph LaForte."

21.     Defendant JOSEPH LAFORTE was released from prison in or about February 2011.  He formed Par Funding that same year, while on supervised release, in the name of his wife, Lisa McElhone.  Since that time, through in or about July 2020, defendant JOSEPH LAFORTE controlled the day-to-day operations of Par Funding and the Par Funding affiliates and owned and/or operated them indirectly through nominees, including his wife.

22.     Defendant JOSEPH LAFORTE was the undisputed leader of the enterprise, and he furthered its objectives by, among other things, (i) hiding the true identity and criminal history of himself and others, (ii) making material misrepresentations and omissions to investors and by causing others to do the same, (iii) diverting and facilitating the diversion of Par Funding's money for the benefit of the enterprise and its members and associates, including through sham MCA contracts and conflict-of-interest transactions, and (iv) participating in the falsification and manipulation of Par Funding's financial and business records.  Defendant JOSEPH LAFORTE also used extortionate means, including violence and express and implied

threats of violence, and directed other members of the enterprise to use extortionate means, to collect payments from Par Funding's merchant-customers. Defendant JOSEPH LAFORTE used express and implied threats of violence to further the enterprise's objectives of obstructing justice. Finally, defendant JOSEPH LAFORTE committed perjury, and obstructed justice by conspiring to suborn the perjury of Par Funding employees, to further the goals of the enterprise.

**Defendant JOE COLE**

23. Defendant JOE COLE was hired to serve as the Chief Financial Officer ("CFO") of Par Funding in or about 2012. At the time, he had not completed college and had never obtained an accounting degree. Before he was hired, defendant COLE had worked as a staff accountant for a publicly traded specialty construction company and had moonlighted as a competitive food eater. Defendant COLE served as the CFO of Par Funding and the Par Funding affiliates until in or about July 2020. Defendant COLE was an employee of Par Funding until in or about early 2017, when all of the company's employees except Lisa McElhone were converted to employees of Full Spectrum Processing, Inc. Nonetheless, he still served as Par Funding's Chief Financial Officer. At all times, defendant COLE reported directly to defendant JOSEPH LAFORTE.

24. Defendant JOE COLE served as defendant JOSEPH LAFORTE's second-in-command at Par Funding and he was directly involved in furthering the enterprise's objectives by, among other things, (i) hiding the true identity and criminal history of defendant JOSEPH LAFORTE and others, (ii) making and facilitating material misrepresentations and omissions to be made to investors, (iii) facilitating the diversion of Par Funding's money for the benefit of the enterprise and its members, and (iv) participating in the falsification and manipulation of Par

11

Funding's financial and business records. Defendant JOE COLE also committed perjury, and obstructed justice by conspiring to suborn the perjury of Par Funding employees, to further the goals of the enterprise.

**Defendant JAMES LAFORTE**

25. Defendant JAMES LAFORTE, a/k/a "Jimmy Schillaci," is defendant JOSEPH LAFORTE's younger brother. On or about October 4, 2006, as part of the same New York state fraud prosecution described in paragraph 20, defendant JAMES LAFORTE was also convicted of grand larceny and money laundering, and he was sentenced to 5 to 15 years' imprisonment and ordered to pay restitution of approximately $14 million. On or about August 11, 2009, defendant JAMES LAFORTE was convicted of conspiracy, collection of extortionate debt by extortionate means, and interference with commerce by threats or violence, in the United States District Court for the District of New Jersey and was sentenced to 36 months' imprisonment. On or about January 27, 2012, defendant JAMES LAFORTE was convicted of illegal gambling in the District of New Jersey and was sentenced to 17 months' imprisonment. Information regarding these convictions was available on the internet under the name "James LaForte." Defendant JAMES LAFORTE began working for Par Funding and the Par Funding affiliates in various capacities beginning in or about July 2016, after his release from prison on his gambling conviction.

26. Defendant JAMES LAFORTE advanced the enterprise's objectives by, among other things, (i) hiding the true identity and criminal history of defendant JOSEPH LAFORTE and others, (ii) diverting and facilitating the diversion of Par Funding's money for the benefit of the enterprise and its members, and (iii) participating in the falsification and

manipulation of Par Funding's financial and business records. Defendant JAMES LAFORTE also acted as an enforcer for the enterprise and used extortionate means, including violence and express and implied threats of violence, to collect payments from Par Funding's customers and to obstruct justice and tamper with and retaliate against witnesses and others.

**Lisa McElhone**

27.     Lisa McElhone, charged elsewhere, functioned as defendant JOSEPH LAFORTE's nominee, and she owned Par Funding through a trust. She also held the titles of Chief Executive Officer and President of Par Funding, although she did not regularly exercise the powers of these offices. McElhone was also the nominal owner of Full Spectrum Processing, the entity to which Par Funding's employees were transferred in early 2017. As a result, as of 2017 she was Par Funding's sole employee, although she was rarely present at its offices. While serving as the nominal owner and executive of Par Funding, McElhone ran the day-to-day operations of an unrelated nail salon in Philadelphia, Pennsylvania.

28.     Lisa McElhone furthered the objectives of the enterprise by serving as the nominee through which defendant JOSEPH LAFORTE secretly controlled Par Funding, through which the enterprise made money, and by otherwise serving as the conduit through whom defendant JOSEPH LAFORTE controlled Par Funding and the Par Funding affiliates, and obtained proceeds from Par Funding and the Par Funding affiliates for the benefit of the members of the enterprise.

**Renato Gioe**

29.     Renato Gioe, charged elsewhere, worked for Par Funding from approximately 2013 through 2018 as a contractor for the company's collections department.

13

During this time, Gioe acted as an "enforcer" for the enterprise and used extortionate means, including express and implied threats of violence, to collect payments from merchant-customers of Par Funding and the Par Funding affiliates.

**Perry Abbonizio**

30.     Perry Abbonizio, charged elsewhere, raised capital for Par Funding starting in or about Spring 2016.  In this role, Abbonizio used the title Principal, even though he did not have an ownership interest in the company.  Abbonizio provided information to potential investors about Par Funding, solicited funds directly from investors and prospective investors, and conveyed information about Par Funding to the managers of the Agent Funds.  At all times, Abbonizio reported directly to defendant JOSEPH LAFORTE.

31.     Perry Abbonizio furthered the objectives of the enterprise by hiding the true identity and criminal history of defendant JOSEPH LAFORTE and others, and by making and facilitating material misrepresentations and omissions to investors.

**Person No. 1**

32.     Person No. 1 operated an investment company ("Investment Company No. 1").  Through this company, Person No. 1 and his employees recruited individuals to invest in Par Funding directly and later indirectly through the Agent Funds, working closely with defendants JOSEPH LAFORTE and JOE COLE, and Perry Abbonizio.  Person No. 1 helped various persons ("Agent Funds managers") open an Agent Fund that issued and sold securities, complete with training, marketing materials, and an Agent Guide, as well as a Private Placement Memorandum, corporate registration, and offering materials provided by Person No. 1's attorney.  Person No. 1 then managed the Agent Funds through one of his companies, working

14

closely with Abbonizio, who oversaw and coordinated the Agent Funds on behalf of Par Funding and defendant JOSEPH LAFORTE. Person No. 1 also operated two Agent Funds.

33. Person No. 1 furthered the objectives of the enterprise by hiding the true identity and criminal history of defendant JOSEPH LAFORTE and others, and by making and facilitating material misrepresentations and omissions to investors.

### The Enterprise's Operation of Par Funding

34. Defendant JOSEPH LAFORTE controlled the day-to-day operations of Par Funding and the Par Funding affiliates and owned and/or operated them indirectly through nominees. Nevertheless, defendant JOSEPH LAFORTE was not listed on any corporate documents as Par Funding's Chief Executive Officer or President, despite serving in these roles. This structure was utilized to hide defendant JOSEPH LAFORTE's control of Par Funding and the Par Funding affiliates from the outside world, including from investors, due to his significant criminal convictions, including for financial crimes.

35. Defendant JOSEPH LAFORTE and Lisa McElhone caused two companies, Heritage Business Consulting, Inc. ("HBC") and Eagle Six Consultants, Inc. ("Eagle Six"), to be created, to which they directed much of defendant JOSEPH LAFORTE's income from Par Funding and the Par Funding affiliates. HBC and Eagle Six were formed in Florida in or about 2014 and 2018, respectively.

36. Defendant JOSEPH LAFORTE (through his nominee Lisa McElhone), defendant JOE COLE, and Perry Abbonizio received compensation from Par Funding via consulting agreements. Pursuant to these agreements, entities controlled by defendants JOSEPH LAFORTE and COLE and Abbonizio were paid quarterly compensation equal to a percentage of

the total amount of funding provided by Par Funding and the Par Funding affiliates to its MCA merchant-customers. This compensation structure financially incentivized the defendants to cause Par Funding and the Par Funding affiliates to fund as many MCA transactions as possible.

37. To generate the capital necessary for Par Funding to fund MCAs to merchant-customers that in turn generated the lucrative consulting payments, defendants JOSEPH LAFORTE, JOE COLE, and JAMES LAFORTE raised approximately $550 million from investors for Par Funding. As a result of these fundraising efforts, defendant JOSEPH LAFORTE and Lisa McElhone received approximately $95 million of consulting payments, defendant JOE COLE received approximately $5 million of consulting payments, and Abbonizio received approximately $13 million of consulting payments.

38. From approximately 2012 through in or about December 2017, Par Funding raised capital directly from investors to fund its operations. It did so by selling promissory notes directly to investors in Par Funding. These promissory notes typically had a 12-month duration and provided that the investor would receive annual interest rates ranging from 12% to 44%. Investors signed a Non-Negotiable Term Promissory Note and an accompanying Security Agreement (collectively, the "Par Funding Notes"). Defendant JOE COLE and Lisa McElhone signed these notes on behalf of Par Funding.

39. The Par Funding Notes generally provided that the interest would be paid over twelve months, and then the investor's principal investment would be returned in full to the investor. The Security Agreements granted the investors a security interest in substantially all of the assets of Par Funding, including its accounts receivable.

16

40.     To locate and solicit investors, Par Funding contracted with sales agents through Finders Agreements.  The Finders Agreements provided that once Par Funding received investor funds, it would pay the sales agent a one-time distribution.

41.     Using information and misinformation that they learned from defendants JOSEPH LAFORTE and JOE COLE, Perry Abbonizio, and Person No. 1, these sales agents met with potential investors and described Par Funding's MCA business and made representations about the expertise of its managers.  They also provided potential investors with marketing materials obtained from Par Funding, including multiple brochures.  The sales agents rarely disclosed defendant JOSEPH LAFORTE's true name or role at and control over the company, and they did not disclose his criminal history, frequently because it had been concealed from them.

42.     By in or about December 2017, Par Funding had raised at least $100 million from investors through the offer and sale of the Par Funding Notes.  The investors purchased the Par Funding Notes by sending funds directly to Par Funding or through self-directed IRA accounts.

43.     In or about early 2018, defendants JOSEPH LAFORTE and JOE COLE, Perry Abbonizio, and Person No. 1 restructured the way that Par Funding and its affiliates raised capital to fund their MCA business.  In response to a January 2018 subpoena received from Pennsylvania securities regulators in connection with their investigation of the company's use of unregistered sales agents, Par Funding restructured its offering by converting its sales agents to Agent Fund managers.

44.    Under this new structure, Par Funding and the Par Funding affiliates used Agent Funds to offer and sell promissory notes that the Agent Funds issued to investors. The Agent Funds then funneled investor money to Par Funding and its affiliates, which then issued Par Funding Notes to the Agent Funds (at a higher interest than the notes issued to the investors).

45.    Person No. 1, Par Funding's most successful sales agent, proposed this new structure. As a result, when it was implemented, Person No. 1 assisted the defendants in creating, managing, and promoting it. He also operated two of his own Agent Funds.

46.    When new Agent Fund managers were identified, Person No. 1 helped them establish their funds, and Perry Abbonizio and Person No. 1 trained them on how to raise money through securities offerings that would ultimately fuel Par Funding. As part of this guidance, Person No. 1 provided Agent Fund managers with an Agent Guide that instructed them how to create an Agent Fund. Par Funding, through Perry Abbonizio and Person No. 1, also trained the Agent Fund managers. In addition, Par Funding provided them with marketing materials, including brochures, to solicit investors. Perry Abbonizio and Person No. 1 then oversaw the Agent Funds, and Person No. 1 managed them through his company in exchange for 25% of the Agent Funds' profits.

47.    As explained in greater detail below, the members and associates of the enterprise concealed various material facts from investors in the Agent Funds. For example, the Agent Funds' private placement memoranda ("PPMs") distributed to potential investors stated that the Agent Funds were raising money to invest in "an MCA company" but did not identify this company as Par Funding and the Par Funding affiliates. The Agent Fund PPMs also did not disclose material information, such as that Par Funding and the Par Funding affiliates were

18

managed by a convicted felon, that the company had been operating at a net cash shortfall since 2016, that the company's insurance was ineffective, and that its purportedly rigorous underwriting and onsite inspections system was flawed in multiple ways.

48. The Agent Fund managers were told that their funds would be invested in Par Funding, and they often told this to their investors, but the Agent Fund managers did not share many material facts about Par Funding with the investors, generally because the defendants concealed these facts from the Agent Fund managers.

49. As a result of this restructuring, from in or about January 2018 through in or about March 2020, Par Funding raised investor money primarily through Agent Funds, and occasionally by selling its own Par Funding Notes directly to investors. Par Funding used at least 40 different Agent Fund managers.

50. During this period, Par Funding, through defendants JOSEPH LAFORTE and JOE COLE and Perry Abbonizio, helped solicit investors to invest in the Agent Funds by speaking at events that the Agent Funds, including Investment Company No. 1, organized to raise money from potential investors. In addition, Abbonizio and defendant JOSEPH LAFORTE helped the Agent Funds solicit investors through telephone calls, and defendants JOSEPH LAFORTE and COLE, and Abbonizio, assisted by soliciting investors during meetings the Agent Funds arranged at Par Funding's office. As a result, defendants JOSEPH LAFORTE and COLE, and Abbonizio, caused, directly and indirectly, many of the misrepresentations made to investors and potential investors in the Agent Funds.

**The Racketeering Conspiracy**

51.     From at least in or about October 2011 through in or about May 23, 2023, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

together and with Lisa McElhone, Renato Gioe, Perry Abbonizio, Person No. 1, Person No. 2, and other persons known and unknown to the grand jury, each being a person employed by and associated with the enterprise described above in paragraphs 1 through 50, which engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly combined, conspired, confederated, and agreed with each other and with others known and unknown to the grand jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), which pattern of racketeering activity consisted of multiple acts indictable under:

        a.     18 U.S.C. § 1343 (relating to wire fraud);

        b.     15 U.S.C.§§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5 (relating to fraud in the sale of securities);

        c.     18 U.S.C. § 894 (relating to extortionate credit transactions);

d.      18 U.S.C. § 1503 (relating to obstruction of justice);

e.      18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant); and

f.      18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant).

52.     It was part of the conspiracy that each defendant agreed that other members and associates of the enterprise would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## Manner and Means of the Enterprise

53.     The manner and means by which the members and associates of the enterprise agreed to conduct and participate in the conduct of the affairs of the enterprise included, but were not limited to, the following schemes and actions.

### (1)      Wire and Securities Fraud

54.     Members and associates of the enterprise, made and caused others to make false and misleading representations to, and concealed and caused others to conceal material facts from, investors and potential investors to deceive them into investing and continuing to invest in Par Funding and the Agent Funds.  These misrepresentations and material omissions related to:

a.      defendant JOSEPH LAFORTE's true name, his actual role with Par Funding and the Par Funding affiliates, and his criminal history, as well as defendant JAMES LAFORTE's true name, involvement with Par Funding and the Par Funding affiliates, and his criminal history;

b.  the underwriting process at Par Funding and the Par Funding affiliates;

c.  the MCA portfolio of Par Funding and the Par Funding affiliates;

d.  the business performance of Par Funding and the Par Funding affiliates, including their default rate and "Exposure %;"

e.  the financial success and profitability of Par Funding and the Par Funding affiliates;

f.  the insurance that the defendants had purchased for Par Funding, the Par Funding affiliates, and certain Agent Funds; and

g.  the self-dealing in which the defendants engaged.

55.  The members and associates of the enterprise were financially incentivized to make and cause others to make these misrepresentations and material omissions for financial gain.  For instance, under the consulting agreements, entities controlled by defendants JOSEPH LAFORTE and JOE COLE, as well as Perry Abbonizio, received a commission fee that was a percentage of the funds extended to merchant-customers, regardless of whether the MCAs extended were successful or profitable for Par Funding and the Par Funding affiliates.  In addition, defendant JAMES LAFORTE received millions of dollars in compensation as a result of his participation in the enterprise.

56.  Defendants JOSEPH LAFORTE, JOE COLE, and JAMES LAFORTE, as well as Perry Abbonizio and other members and associates of the enterprise, took various efforts to conceal their fraudulent scheme, including the following: (1) using aliases and nominees, including to hide their self-dealing; (2) hiding defendant JOSEPH LAFORTE's role in and

control over Par Funding from its financial auditors; (3) causing an attorney to distribute misleading letters to investors and the media; (4) causing and recording fictitious payments to Par Funding purportedly by merchant-customers in order to make it appear that certain MCAs were not in default; (5) causing merchant-customers to make de minimis MCA repayments to create the false appearance that the customers were not in default; (6) conducting a publicity campaign to conceal negative information regarding defendant JOSEPH LAFORTE; (7) testifying falsely during civil depositions and causing others to testify falsely; and (8) providing and causing others to provide false information in court proceedings.

57.　　The defendants used, and caused others to use, the wires and facilities of interstate and foreign commerce to carry out this scheme.

### *Deception Regarding the Leadership of Par Funding*

58.　　As part of efforts to raise capital for Par Funding, members and associates of the enterprise, including the Par Funding affiliates and the defendants took various steps to conceal the truth about Par Funding's leadership.　This deception included: (i) concealing defendant JOSEPH LAFORTE's true name through false and misleading statements, as well as material omissions; (ii) making false and misleading statements regarding his actual role with Par Funding and the roles of others, including Lisa McElhone, his wife and the nominal owner of Par Funding, defendant JOE COLE, the Chief Financial Officer of Par Funding, defendant JAMES LAFORTE, and Perry Abbonizio; and (iii) concealing the criminal history of defendants JOSEPH LAFORTE and JAMES LAFORTE.

59.　　As part of this concealment, defendant JOSEPH LAFORTE established and operated Par Funding and the Par Funding affiliates in the name of McElhone and others,

even though defendant JOSEPH LAFORTE ran the day-to-day operations of the business and regularly referred to the enterprise as his business and the company's capital as his money.

60. Defendant JOSEPH LAFORTE used multiple aliases to conceal his identity and, thereby, conceal his background, including his criminal history. These aliases included "Joe Mack," "Joe Macki," "Joe Mackie," and "Joe McElhone." As a result of the use of these aliases, many of the employees of Par Funding did not know defendant JOSEPH LAFORTE's real name until months or years after they began working at the company, and many outside parties, such as investors, outside attorneys, and outside accountants, never learned his real name or his role at the company. By using these aliases with not just investors and potential investors, but also most other persons, defendant JOSEPH LAFORTE and members and associates of the enterprise were better able to conceal defendant JOSEPH LAFORTE's background, including his felony convictions, from the investors and their advisors.

61. Defendant JAMES LAFORTE used the alias "Jimmy Schillaci," and defendant JOSEPH COLE BARLETA used the alias "Joe Cole."

62. The defendants regularly caused others, including Perry Abbonizio, Person No. 1, and various Agent Fund managers to solicit potential investors and interact with existing investors in ways that concealed defendant JOSEPH LAFORTE's identity and role at Par Funding.

63. As part of this deception, defendant JOSEPH LAFORTE used multiple email addresses that concealed his identity. While using these email addresses, defendant JOSEPH LAFORTE regularly signed the emails that he sent using his aliases. Defendant JOSEPH LAFORTE even had business cards that he distributed with the name "Joe Macki."

64. Even after at least two articles were published in December 2018 describing defendant JOSEPH LAFORTE's role at Par Funding, his true name, his criminal history, and his family's alleged connection to an organized crime entity, defendant JOSEPH LAFORTE and members and associates of the enterprise continued to take various efforts to conceal his true name, role, and criminal history, including the following:

a. Defendants JOSEPH LAFORTE and JAMES LAFORTE continued to use aliases or otherwise conceal their true names when interacting with many outside parties, including investors and potential investors.

b. The defendants, Perry Abbonizio, and Person No. 2, another employee of Par Funding and the Par Funding affiliates who reported to defendant JOSEPH LAFORTE, caused a lawyer for Par Funding to distribute two false and misleading letters to investors and others in response to the articles published in December 2018.

c. In or about early 2019, the defendants engaged in a deceptive public relations campaign that touted defendant JOSEPH LAFORTE's purported financial and business acumen and his success through Par Funding, but failed to disclose his criminal history. For instance, in or about January 2019, defendant JOSEPH LAFORTE caused a LinkedIn account to be created and registered in his name that contained misleading information regarding his education, experience, and role at Par Funding and failed to disclose his criminal history. In the following months, the members and associates of the enterprise caused numerous online articles, posts, and press releases to be published online. Not only did these publications generally contain misleading information regarding defendant JOSEPH LAFORTE and consistently omit his criminal history, but they also served to bury the unfavorable information

that an internet search for his name would have otherwise yielded.

d. Defendants JOSEPH LAFORTE and JOE COLE caused Par Funding to submit false and misleading Form D filings to the SEC for 2019 and 2020. These forms identified defendant JOE COLE and Lisa McElhone, as well as Person No. 3, McElhone's sister, as "Related Persons" of Par Funding, but failed to identify defendant JOSEPH LAFORTE among the "Related Persons," despite the fact that the forms' instructions stated that this item should include "[e]ach executive officer and director of the issuer and person performing similar functions (title alone is not determinative) for the issuer."

65. During in or about 2019 and 2020, the defendants and members and associates of the enterprise continued to cause others to conceal defendant JOSEPH LAFORTE's name, role, and criminal history with misleading statements and material omissions.

### *Deception Regarding the Company's Underwriting Process*

66. As part of fundraising efforts, members and associates of the enterprise, including the defendants, touted Par Funding's supposedly robust underwriting process to investors and potential investors in misleading ways. For instance, the defendants caused marketing brochures to be created and distributed for Par Funding that described its underwriting process deceptively. In addition, the defendants caused Par Funding's representatives and the Agent Fund managers to describe the company's underwriting process in various deceptive ways.

67. When touting and causing others to tout Par Funding's underwriting, the actions of the members and associates of the enterprise included the following:

a. Describing and causing others to describe Par Funding's underwriting process as rigorous, even though Par Funding had been steadily decreasing the amount, duration, and quality of its underwriting before funding MCAs;

b. Describing and causing others to describe Par Funding's underwriting process as rigorous, even though at times the company did not conduct either any underwriting or onsite inspections of potential MCA customers on deals below certain thresholds;

c. Describing and causing others to describe Par Funding's underwriting process as rigorous, even though defendants JOSEPH LAFORTE and JAMES LAFORTE regularly exempted certain MCAs from any due diligence, including many of the company's largest MCA customers;

d. Describing and causing others to describe Par Funding's underwriting process as rigorous, even though defendant JOSEPH LAFORTE regularly approved new and reloaded MCAs for entities owned by Customer No. 1 ("Customer No. 1's Entities") without underwriting in exchange for under-the-table cash kickbacks to defendant JOSEPH LAFORTE;

e. Describing and causing others to describe Par Funding's underwriting process as rigorous, even though defendant JOSEPH LAFORTE incentivized the company's underwriting staff to increase the pace of its approval process through regular off-the-books cash payments; and

f. Asserting and causing others to assert that Par Funding conducted onsite inspections of merchant-customers on every deal, even though Par Funding regularly did

not conduct such inspections and when onsite inspections were performed, a material number of these inspections were inconclusive or negative in terms of the financial health of the merchant-customer, and the merchant-customer was offered an MCA anyway.

### *Deception Regarding the Company's MCA Portfolio*

68.    As part of fundraising efforts, members and associates of the enterprise, including the defendants, promoted the supposed diversification of Par Funding's MCA portfolio. For example, the members and associates of the enterprise caused marketing brochures for Par Funding to be distributed stating that the company's advances to merchant-customers ranged from $5,000 to $500,000, with the average funding size of $50,000. The members and associates of the enterprise also made similar oral representations to investors and potential investors. Furthermore, the members and associates of the enterprise explained and caused others to explain to investors and potential investors that this supposedly diverse portfolio, consisting of many smaller merchant-customer clients, decreased the risk to their investment.

69.    In reality, however, as the defendants knew, a large portion of Par Funding's outstanding accounts receivable was attributable to a small set of merchant-customers whose collective MCAs had grown substantially over time. For example, by in or about July 2018, at least one third of the company's outstanding accounts receivable were held by a small group of merchant-customer businesses under the control of approximately ten people, each of which owed millions if not tens of millions of dollars to Par Funding. By in or about July 2020, this percentage had grown to approximately 50%. One of these individuals, Customer No. 1, who was paying defendant JOSEPH LAFORTE under-the-table cash kickbacks of approximately

10% of all money extended to his businesses by Par Funding, controlled five merchant-customers (Customer No. 1's Entities) which by in or about July 2018 owed more than approximately $22 million to Par Funding, and which owed in excess of approximately $90 million by in or about July 2020. While promoting the diversity of the company's client base, the defendants concealed these facts from investors and potential investors.

70. To help conceal the lack of diversification in Par Funding's MCA portfolio, defendants JOSEPH LAFORTE and JOE COLE often caused these large merchant-customers to take multiple MCAs, frequently through different companies that the merchant-customers owned, so that it appeared that the risk was more diversified.

*Deception Regarding MCA Performance*

71. As part of their fundraising efforts, members and associates of the enterprise, including the defendants, made and caused others to make false and misleading claims to investors, potential investors, and others regarding the performance of Par Funding's MCAs. For example, the members and associates of the enterprise frequently represented or caused others to represent that Par Funding's default rate was approximately 1% to 2% and compared extremely favorably to its competitor MCA companies. In reality, as the members and associates of the enterprise knew, Par Funding's default rate was significantly higher than what was represented to investors.

72. On or about December 20, 2018, for example, defendant JOSEPH LAFORTE falsely told investors and potential investors in Par Funding: "I got six years of financials that say that I have a one percent default rate. If you insure a cash advance company it's like insuring a burning house, most of these other companies. They have 25 percent default

rates.  So to answer your question . . . I think, and you can tell your clients that, we have a six, six we're going on seven-year track record of less than one percent default rate as it is."

73.    Defendant JOE COLE created and regularly updated a funding analysis document, which purportedly set forth Par Funding's key performance indicators, including its purported "Exposure %."  Defendants COLE and JOSEPH LAFORTE regularly caused this funding analysis document to be provided to investors and potential investors.  Although the "exposure" percentage in the funding analysis document was not a percentage of the MCAs that were in default, the members and associates of the enterprise regularly described and caused others to describe this percentage to investors, potential investors, and others as Par Funding's default rate, which was false and misleading.  To reinforce this false and misleading definition, the members and associates of the enterprise often stated and caused others to state that this default rate compared extremely favorably with an alleged industry default rate, which they claimed was approximately 15% to 25%.  Furthermore, even the "Exposure %" set forth in the funding analysis was misleading in several ways.

74.    Additionally, defendants JOSEPH LAFORTE and JOE COLE manipulated Par Funding's "Exposure %" (and, thus, its promoted default rate) when they made decisions about which of the company's MCA deals would be recognized as being in default in Par Funding's accounting records.  As part of this effort, defendants JOSEPH LAFORTE and COLE conferred on a regular basis regarding which delinquent MCAs should be written off as in default.  Rather than applying the company's policy of writing off MCAs for which no payments had been made in six to eight weeks, they exercised a subjective standard to decide whether to write off a delinquent MCA.  As a result, they frequently failed to write off MCAs for which no

payment had been made in six to eight weeks in order to conceal the company's true performance, thereby keeping its exposure percentage and default rate artificially low.

75. To further manipulate Par Funding's performance indicators, defendants JOSEPH LAFORTE and JOE COLE caused the company to enter numerous new "reload" MCA transactions with merchant-customers that were in default, which served to conceal these defaults. In other words, the defendants' solution for a non-paying MCA customer was often to lend the delinquent customer even more investor money. Through these reloads, delinquent merchant-customers remained out of default, but their obligations to Par Funding escalated rapidly, frequently to amounts that the "reloaded" merchant-customers could not pay. Thus, the liberal use of reloads by the members and associates of the enterprise further enabled them to avoid declaring many merchant-customers in default and, thus, to conceal Par Funding's true performance.

76. Defendants JOSEPH LAFORTE and JOE COLE also caused fictitious merchant-customer payments to appear on Par Funding's books in order to manipulate its performance indicators, including its "Exposure %" and claimed default rate. Defendants JOSEPH LAFORTE and COLE accomplished this by causing fictitious MCA repayments for overdue MCAs to be recorded on Par Funding's books, thereby creating the false appearance that these delinquent merchant-customers had been making repayments to Par Funding. Defendants JOSEPH LAFORTE and COLE also made these fictitious customer payments to attempt to hide nonperforming MCAs from Par Funding's auditors.

77. In or about late 2018, Par Funding's auditors determined that the company had suffered a loss of approximately $6.6 million in 2017, due in large part to the company

failing to write off bad debt that the auditors believed was not collectable. In response to the auditor's conclusion, defendant JOSEPH LAFORTE caused Person No. 2 to demand that the auditors rely on the faulty bad debt calculation of defendants JOSEPH LAFORTE and JOE COLE, which the auditors did in an "adverse opinion" that misleadingly stated that the company had $1.2 million of net income in 2017.

### Deception Regarding the Company's Success and Profitability

78. As part of fundraising efforts, members and associates of the enterprise, including defendants JOSEPH LAFORTE and JOE COLE, made and caused others to make false claims to investors and potential investors regarding Par Funding's success and profitability, when, in actuality, from 2016 through July 2020 the net cash flow from Par Funding's MCA business was not sufficient to pay the promised investor returns and business expenses in any of these years, meaning that the business was operating at a loss, not a profit. For example, in 2018 Par Funding had a net cash shortfall of approximately $50 million, and in 2019 it had a net cash shortfall exceeding $70 million. This financial reality notwithstanding, on or about November 21, 2019, defendant JOSEPH LAFORTE, while in the presence of defendant COLE, Perry Abbonizio, and Person No. 1, told a large group of investors and potential investors, "And just to brag a little about the company, we're probably the most profitable cash advance company in the United States – or maybe the world for that matter, pound for pound."

79. Despite knowing Par Funding was not profitable, defendants JOSEPH LAFORTE and JOE COLE continued to raise funds from investors in order to continue their scheme, receive additional consulting payments, and conceal the fact that Par Funding's MCA revenue was insufficient to repay investors and its business expenses.

80.     While raising funds from investors based on these false statements, defendants JOSEPH LAFORTE and JOE COLE, as well as Perry Abbonizio, concealed from investors that they were making large distributions to themselves with the investors' funds despite the fact that as a result of these distributions, Par Funding's MCA business generated insufficient returns to pay its operating expenses and repay investors.

81.     To conceal this fraudulent conduct, defendants JOSEPH LAFORTE and JOE COLE often decided not to write off material amounts of Par Funding's accounts receivable as bad debt, despite the fact that no payments had been made on these MCAs in eight weeks or longer.

### Deception Regarding Insurance

82.     As part of their fundraising efforts, members and associates of the enterprise, including the defendants, represented or caused others to represent to investors and prospective investors that Par Funding's MCAs were insured, even though they knew that this insurance would not provide the company or the investors with the protection that they sought.

83.     Furthermore, despite learning as early as December 2018 and no later than August 2019 that Par Funding's insurance policy would not cover losses as a result of Par Funding's merchant-customers defaulting on their MCAs, but rather would only cover losses from a traditional factoring arrangement, the defendants, Perry Abbonizio, and Person No. 1 did not correct prior representations, or prevent further misrepresentations, about coverage under the insurance policy.

84.     After in or about August 2019, the defendants and members and associates of the enterprise caused Par Funding to distribute misleading marketing brochures stating that

33

Par Funding carried insurance even though they knew that Par Funding's insurance was ineffectual.

85. After in or about August 2019, the defendants and members and associates of the enterprise caused the Agent Fund managers to continue making false and misleading representations and material omissions regarding the company's insurance because they knew that the prior representations regarding the insurance had been material to existing investors' decisions to invest in Par Funding.

### Deception Regarding Self-Dealing

86. During the fundraising efforts directed to investors and potential investors, members and associates of the enterprise, including the defendants and Perry Abbonizio, concealed that they were engaged in extensive self-dealing to the detriment of investors.

87. For instance, defendants JOSEPH LAFORTE and JAMES LAFORTE frequently caused Par Funding and the Par Funding affiliates to enter repeated "reload" agreements with merchant-customers without adequate due diligence, in circumstances in which those merchant-customers were unlikely to have the means to repay the continually increasing amounts due. As a result of these reload agreements, defendants JOSEPH LAFORTE and COLE, and Abbonizio received additional consulting payments.

88. For certain of these merchant-customers, when they were unable to repay their MCAs to Par Funding and/or the Par Funding affiliates, defendants JOSEPH LAFORTE and JAMES LAFORTE obtained personal ownership interests in these merchant-customers or their successor businesses, often through nominees, including Lisa McElhone, Person No. 2, and Person No. 3 (McElhone's sister), in partial or full settlement of the merchant-customers'

34

obligations to Par Funding and/or the Par Funding affiliates. These merchant-customers included, but were not limited to, Customer No. 2, Customer No. 3, Customer No. 4, and Customer No. 5.

89.    As a result, although the merchant-customers' obligations were owed to Par Funding and the Par Funding affiliates (ultimately for the benefit of their investors), defendant JOSEPH LAFORTE received the benefit of these settlements (to the detriment of the investors).

90.    On numerous occasions, defendant JOSEPH LAFORTE caused Customer No. 1 to make large cash payments directly to defendant JOSEPH LAFORTE as a condition of Par Funding continuing to fund Customer No. 1's Entities. Defendant JOSEPH LAFORTE did not account for these cash payments on Par Funding's books and records.

91.    Defendants JOSEPH LAFORTE and JAMES LAFORTE also caused Par Funding to make unjustified and excessively high payments to defendant JAMES LAFORTE, including an approximate $742,645 "commission" paid to defendant JAMES LAFORTE in or about May 2020 for non-CDC approved COVID 19 masks purchased by Par Funding at defendants JOSEPH LAFORTE and JAMES LAFORTE's direction, and an approximate $900,000 payment to defendant JAMES LAFORTE—via defendant JOSEPH LAFORTE's nominee, Person No. 2—from a civil settlement wherein a merchant-customer of Par Funding bought out the personal ownership share that defendant JOSEPH LAFORTE held in that merchant-customer via his nominee, Person No. 2.

92.    In or about June 2020, defendant JAMES LAFORTE also caused Par Funding to make unjustified payments for his own benefit, including approximately $96,000 of

investor money paid to an alleged merchant-customer of Par Funding, which payment defendant JAMES LAFORTE caused to be funneled back to a bank account that he controlled.

93.     On or about July 27, 2020, after the SEC filed its complaint against defendant JOSEPH LAFORTE in the United States District Court for the Southern District of Florida but while the SEC's motion for a preliminary injunction was still pending, defendant JOSEPH LAFORTE caused Par Funding to enter a fraudulent MCA agreement with Customer No. 1 to funnel approximately $750,000 through one of Customer No. 1's Entities to defendants JOSEPH LAFORTE and JAMES LAFORTE and their nominee, Lisa McElhone.

### (2)     Extortionate Collection of Debt

94.     Members and associates of the enterprise, including Defendant JOSEPH LAFORTE, made hostile, threatening, and intimidating communications to representatives of Par Funding's merchant-customers, including at Par Funding's place of business, in an effort to secure MCA payments from these merchant-customers.

95.     Defendant JOSEPH LAFORTE directed Renato Gioe and defendant JAMES LAFORTE to travel throughout the United States to make unannounced personal visits to the businesses and homes of representatives of the merchant-customers, in order to make hostile, threatening, and intimidating communications to these representatives.

96.     Renato Gioe and defendant JAMES LAFORTE traveled throughout the United States and made unannounced personal visits to representatives of merchant-customers and made hostile threatening and intimidating communications to those representatives.

97.     During these collection efforts, and often in conjunction with Renato Gioe's or defendant JAMES LAFORTE's personal visits to representatives of the merchant-

customers, defendant JOSEPH LAFORTE made hostile, threatening, and intimidating electronic and telephone communications to these representatives. After Gioe or defendant JAMES LAFORTE visited these representatives of the merchant-customers or otherwise threatened them, defendant JOSEPH LAFORTE continued to collect funds from the merchant-customers and continued to make hostile, threatening, and intimidating electronic and telephone communications as necessary to collect on delinquent credit.

### (3)    Obstruction of Justice

98.    Members and associates of the enterprise, including defendants JOSEPH LAFORTE and JOE COLE, gave false testimony during their depositions in civil lawsuits filed against Par Funding and others—alleging, among other things, fraud, RICO violations, civil conspiracy, and breach of contract—in the United States District Court for the Eastern District of Pennsylvania, including the matters captioned *Fleetwood Services, LLC, Robert L. Fleetwood, and Pamela A. Fleetwood vs. Complete Business Solutions Group, Inc. d/b/a Par Funding; Prime Time Funding; John and Jane Does*, which was docketed at Civil Action No. 18-CV-268 (the "*Fleetwood* lawsuit"), and *HMC Inc. and Kara DiPietro v. CBSG d/b/a Par Funding and Fast Advance Funding*, which was docketed at Civil Action No. 19-CV-3285 (the "*HMC* lawsuit"). Among other topics, defendants JOSEPH LAFORTE and COLE lied about who was the boss of, and was operating and responsible for all the business activities of, Par Funding and the Par Funding affiliates.

99.    Defendants JOSEPH LAFORTE and JOE COLE and Attorney No. 1, both together and individually, advanced the enterprise's purpose by coaching, encouraging, and otherwise directing two Par Funding employees, Person No. 5 and Person No. 6, to give false

testimony during their depositions in the *HMC* lawsuit. Among other topics, Person No. 5 and Person No. 6 were coached, encouraged, and otherwise directed to hide that defendant JOSEPH LAFORTE was the boss of and was operating and responsible for all the business activities of Par Funding and the Par Funding affiliates.

100. Defendant JOSEPH LAFORTE threatened to cause bodily injury to O.F. and his wife to influence and interfere with the SEC lawsuit by causing O.F. to artificially inflate the values of a number of real estate properties that the Receiver had seized from JOSEPH LAFORTE and Lisa McElhone during the course of the SEC lawsuit.

101. In contemplation of and with actual knowledge of the SEC lawsuit, defendant JAMES LAFORTE, with the assistance of and in coordination with defendant JOSEPH LAFORTE, physically assaulted G.A., counsel for the Receiver for Par Funding, to retaliate against G.A. and the Receiver for their respective roles in the SEC lawsuit, and for the purpose of attempting to impede those proceedings, including to impede the Receiver's efforts to remove defendant JOSEPH LAFORTE and Lisa McElhone from their primary residence in Haverford, Pennsylvania.

102. In contemplation of and with actual knowledge of the SEC lawsuit and the federal grand jury investigation in the Eastern District of Pennsylvania, defendant JAMES LAFORTE made threats of physical violence to Perry Abbonizio, Abbonizio's family, and Extortion Victim No. 6, for the purpose of impeding those proceedings, including by influencing, delaying, and preventing the testimony of Abbonizio and Extortion Victim No. 6 at those proceedings, and for the purpose of retaliating against Abbonizio and Extortion Victim No. 6 for testimony given, and records produced, by them in those proceedings.

**OVERT ACTS**

In furtherance of the racketeering conspiracy, and to accomplish the object thereof, defendants JOSEPH LAFORTE, JOE COLE, and JAMES LAFORTE, and Renato Gioe, Perry Abbonizio, Person No. 1, Person No. 2, and Person No. 3, and others known and unknown to the grand jury, committed and caused to be committed various acts within the Eastern District of Pennsylvania and elsewhere, including, but not limited to:

1.      In or about October 2011, defendant JOSEPH LAFORTE and Lisa McElhone caused Par Funding to be formed, in Delaware, in the name of McElhone.

2.      In or about August 2013, defendant JOSEPH LAFORTE and Lisa McElhone caused a document to be filed with the Pennsylvania Department of State to register the fictitious name under which Par Funding would do business in Pennsylvania, which document listed McElhone's sister, Person No. 3, as the return addressee, and which document did not mention defendant JOSEPH LAFORTE.

3.      In or about April 2016, after defendants JOSEPH LAFORTE and Lisa McElhone told Perry Abbonizio about defendant JOSEPH LAFORTE's true name and criminal history, defendant JOSEPH LAFORTE and Abbonizio agreed that during Abbonizio's efforts to raise funds for Par Funding, Abbonizio would conceal defendant JOSEPH LAFORTE's true name and criminal history.

4.      On multiple occasions beginning no later than in or about early 2016, at a time when Victim Business No. 1 was financially unable to meet Par Funding's repayment terms, Renato Gioe—at the direction of defendant JOSEPH LAFORTE—appeared unannounced at Victim Business No. 1's barbershops in Philadelphia on a weekly basis, where Gioe demanded

cash payments from Extortion Victim No. 1. When Extortion Victim No. 1 did not have

sufficient cash to meet Gioe's demands, Gioe made hostile, threatening, and intimidating

statements to Extortion Victim No. 1, including that he would physically harm Extortion Victim

No. 1. Par Funding and the Par Funding affiliates continued to collect repayments made by

Extortion Victim No. 1 after these threats were made until on or about September 16, 2019.

5.     On or about July 21, 2017, after receiving a copy of Par Funding's

misleading marketing brochure via email, defendant JOSEPH LAFORTE emailed the brochure

to another employee to print copies of this brochure for defendant JOSEPH LAFORTE's review.

6.     On or about October 12, 2017, defendant JOE COLE requested a copy of

Par Funding's misleading marketing brochure via email from the representative of Par Funding

responsible for maintaining this document.

7.     On or about October 12, 2017, defendant JOSEPH LAFORTE caused

Person No. 2 to send a misleading email to a representative of Par Funding's accounting firm

inaccurately describing the roles of defendant JOE COLE and Lisa McElhone and concealing

defendant JOSEPH LAFORTE's role at Par Funding.

8.     In or about Spring 2017, at a time when Victim Business No. 3 was

financially unable to meet Par Funding's repayment terms, Renato Gioe—at the direction of

defendant JOSEPH LAFORTE—appeared unannounced at Victim Business No. 3's retail store,

where Gioe made hostile, threatening, and intimidating statements to Extortion Victim No. 4

while defendant JOSEPH LAFORTE was listening on the phone, causing Extortion Victim No. 4

to cry. Par Funding continued to collect repayments made by Extortion Victim No. 4 after these

threats were made until in or about April 2018.

9.     On or about February 15, 2018, at a time when Victim Business No. 2 was financially unable to meet Par Funding's repayment terms:

a.     At the direction of defendant JOSEPH LAFORTE, Renato Gioe appeared unannounced at Victim Business No. 2's Los Angeles office and demanded to speak with Extortion Victim No. 2.  Gioe then spoke to Extortion Victim No. 3 and demanded payment on behalf of Par Funding.

b.     While at Victim Business No. 2's office, Renato Gioe made hostile, threatening, and intimidating statements to Extortion Victim No. 3, including telling him that the fact that Victim Business No. 2 owed money to Par Funding could affect "wives, households, and children" and could make "widows," and telling Extortion Victim No. 3 a story about a suspicious car accident involving another person from whom Gioe was trying to collect money on behalf of Par Funding.

10.     On or about February 16, 2018:

a.     At the direction of defendant JOSEPH LAFORTE, Renato Gioe returned to Victim Business No. 2's Los Angeles office and again demanded that Extortion Victim No. 3 "just pay the fucking money," while denying that he had threatened Extortion Victim No. 3 the previous day.

b.     Renato Gioe participated in a telephone call with defendant JOSEPH LAFORTE in the presence of Extortion Victims Nos. 2 and 3 using the speakerphone function, during which defendant JOSEPH LAFORTE told Gioe and Extortion Victims Nos. 2 and 3 that Gioe knew "what to do with this guy [Extortion Victim No. 3]" and to "take care of

him [Extortion Victim No. 3]." Par Funding continued to collect repayments made by Extortion Victims Nos. 2 and 3 from after these threats were made until on or about July 10, 2020.

c.       On or about February 16, 2018, Renato Gioe texted defendant JOSEPH LAFORTE and Person No. 2 in a group message and stated, "I'm on top of [a New York merchant, known to the grand jury]. I'll find out tomorrow with you. Let me feel him. By the way [Extortion Victim No. 3] is scared could not believe I arrived." Defendant JOSEPH LAFORTE then replied, in pertinent part, "Get all monies in. Also you got a few others."

11.      On or about April 12, 2018, defendant JOSEPH LAFORTE sent an email directing that revisions be made to Par Funding's misleading marketing brochure, none of which corrected the misleading aspects of the brochure.

12.      In or about May 2018, at a time when Victim Business No. 7 had missed a scheduled payment to Par Funding, defendant JAMES LAFORTE spoke to Extortion Victim No. 10 on the phone and demanded an immediate payment to Par Funding and told Extortion Victim No. 10 that he was a "soldier for the family" and that he was not to be messed with because he had torched people's cars and kicked people's teeth in.

13.      Par Funding continued to collect repayments from Victim Business No. 7 from after these threats were made until in or about July 2018.

14.      On or about May 4, 2018, defendant JOSEPH LAFORTE caused Person No. 2 to circulate a revised version of the marketing brochure, which contained updated formatting but the same misleading information.

15.      On or about June 1, 2018, defendant JOE COLE provided misleading information during an interview by Par Funding's auditors, knowing that the auditors were

preparing an audit report that would be provided to investors in Par Funding and the Agent Funds.

16.     On or about June 2, 2018, at a time when Victim Business No. 4 was financially unable to meet Par Funding's repayment terms, defendant JOSEPH LAFORTE texted Extortion Victim No. 5, stating "U believe I got to send Gino [Renato Gioe] at you on Monday to get my payments.  Btw your paying for these trips.  He isn't cheap."  Defendant JOSEPH LAFORTE then texted Extortion Victim No. 5 along with Gioe, stating that Gioe would visit with Extortion Victim No. 5 on Monday, June 4, 2018, "with the hopes of receiving our funds on Monday by business close."  Defendant JOSEPH LAFORTE then asked Extortion Victim No. 5 in a text, "If this cannot be accomplished, would u mind if Gino [Gioe] could be a guest at your home until this can be procured."  When Extortion Victim No. 5 responded that he would be willing to let Gioe stay at Extortion Victim No. 5's beach house, defendant JOSEPH LAFORTE responded, "I thought it would be nice if u stayed together."

17.     On or about June 4, 2018:

a.     At the direction of defendant JOSEPH LAFORTE, Renato Gioe arrived at Extortion Victim No. 5's office in Florida, demanded repayment, acted in a hostile and intimidating manner, and refused to leave for approximately eight hours.

b.     While Renato Gioe was at Extortion Victim No. 5's office, Gioe and Extortion Victim No. 5 spoke by phone with defendant JOSEPH LAFORTE about repayment of the funds advanced to Victim Business No. 4.  Defendant JOSEPH LAFORTE and Extortion Victim No. 5 also exchanged text messages, during which Extortion Victim No. 5 pleaded with defendant JOSEPH LAFORTE, "Can you please get Gino [Gioe] the fuck out of

my office, I can't have this shit! I get it, but this doesn't help and I don't want any kind [of] scene."

                c.      Renato Gioe took Extortion Victim No. 5's Rolex watch, which Extortion Victim No. 5 had offered as a gift of appeasement, prompting Extortion Victim No. 5 to plead by text with defendant JOSEPH LAFORTE, "Please call off the hounds.. [sic] and by that I mean that animal [Gioe] you sent down here."

            18.      Par Funding continued to collect repayments made by Extortion Victim No. 5 after these threats were made.

            19.      On or about June 26, 2018, defendant JAMES LAFORTE emailed a copy of Par Funding's misleading marketing brochure to defendant JOSEPH LAFORTE.

            20.      In or about July 2018, at a time when Victim Business No. 7 was financially unable to meet Par Funding's repayment terms, defendant JAMES LAFORTE spoke to Extortion Victim No. 10 on the phone and told him that he would kill Extortion Victim No. 10 if he filed for bankruptcy and stopped paying the money owed to Par Funding.

            21.      On or about August 7, 2018, defendant JOSEPH LAFORTE obtained a significant personal ownership stake in one of Par Funding's MCA merchant-customers, due to the merchant-customer's failure to make timely payments to Par Funding, which ownership interest he placed in the name of his nominee, Person No. 3, who was Lisa McElhone's sister.

            22.      On or about September 19, 2018, Lisa McElhone provided misleading information during an interview by Par Funding's auditors, knowing that the auditors were preparing an audit report that would be provided to investors in Par Funding and the Agent Funds.

23.    On or about October 5, 2018, defendant JOSEPH LAFORTE sent a text message directing Customer No. 1's driver to come to the offices of Par Funding to deliver a cash kickback.

24.    On or about November 8, 2018, defendant JOSEPH LAFORTE sent an email to Person No. 4, a member of Par Funding's accounting staff, directing that an MCA transaction not be written off in order to manipulate Par Funding's default rate and funding analysis.

25.    On or about December 20, 2018, defendant JOSEPH LAFORTE, Perry Abbonizio, and Person No. 1 participated in a conference call with Agent Fund managers to provide an update regarding Par Funding.  Abbonizio introduced defendant JOSEPH LAFORTE by his alias and failed to disclose his true name and his criminal history.  Defendant JOSEPH LAFORTE then made multiple misleading statements to the participants, including regarding his background and Par Funding's default rate, underwriting, insurance, and profitability.

26.    On or about December 20, 2018, Perry Abbonizio emailed a misleading letter to one of the Agent Fund's managers to address a recent article published regarding Par Funding and defendant JOSEPH LAFORTE.

27.    On or about December 21, 2018, defendants JOSEPH LAFORTE and JOE COLE and Perry Abbonizio caused Person No. 2 to email them a misleading letter that would be distributed to various parties, including investors and potential investors in Par Funding and the Agent Funds.

28.     In or about January 2019, defendant JOSEPH LAFORTE caused Par Funding to hire a "reputation manager" to help conceal defendant JOSEPH LAFORTE's criminal history from investors and potential investors.

29.     In or about February 2019, defendants JOSEPH LAFORTE and JOE COLE caused Par Funding and the Par Funding affiliates to submit misleading Form D filings to the SEC, stating, among other things, that the "Related Persons" of Par Funding and the Par Funding affiliates were defendant COLE, Lisa McElhone, and/or Person No. 3, McElhone's sister, but omitting defendant JOSEPH LAFORTE, who was operating Par Funding and the Par Funding affiliates on a day-to-day basis.

30.     In or about February 2019, at a time when Victim Business No. 6 was financially unable to meet Par Funding's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 9—the bookkeeper of Victim Business No. 6 and the spouse of Extortion Victim No. 8—on the phone and said that if Extortion Victim No. 9 did not repay Par Funding, then one day Extortion Victim No. 9 would turn on Extortion Victim No. 9's car and "poof," which Extortion Victim No. 9 understood to be a threat to blow up Extortion Victim No. 9's car.

31.     In or about April 2019, at a time when Victim Business No. 6 was financially unable to meet Par Funding's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 9 on the phone and said that if Extortion Victim No. 9 did not repay Par Funding, then one day when Extortion Victim No. 9 went to pick up Extortion Victim No. 9's children from school, they would not be there.

32.     In or about March 2019, at a time when Victim Business No. 8 was financially unable to meet Par Funding's repayment terms, defendant JAMES LAFORTE spoke to Extortion Victim No. 11 on the phone and told him that he would kill Extortion Victim No. 11 and his family if he did not pay the money owed to Par Funding.  Par Funding continued to collect repayments from Victim Business No. 8 from after these threats were made until in or about March 2020.

33.     On or about May 6, 2019, at a time when Victim Business No. 5 was financially unable to meet Par Funding's repayment terms, defendant JOSEPH LAFORTE met with Extortion Victim No. 6 and her employee, Extortion Victim No. 7, and threatened to "blow up" Extortion Victim No. 6's home if she did not comply with defendant JOSEPH LAFORTE's repayment demands.

34.     Par Funding continued to collect repayment from Victim Business No. 5 after these threats were made.

35.     On or about May 9, 2019, defendant JOE COLE sent an email to defendant JOSEPH LAFORTE attaching a version of defendant COLE's funding analysis containing a deceptive and inaccurate "Exposure %," seeking defendant JOSEPH LAFORTE's approval to email the funding analysis to investors.

36.     In or about August 2019, at a time when Victim Business No. 6 was financially unable to meet Par Funding's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 9 on the phone and asked if Extortion Victim No. 9 had ever heard of "cement shoes" and then told Extortion Victim No. 9 that Extortion Victim No. 9 would end up at the bottom of the Hudson River.

37. On or about August 1, 2019, defendant JOSEPH LAFORTE sent an email to Person No. 4, copying defendant JOE COLE, directing that an MCA transaction not be written off in order to manipulate Par Funding's default rate and funding analysis.

38. On or about August 15, 2019, during a solicitation event in Wildwood, Florida, Perry Abbonizio described the "great team" at Par Funding but failed to disclose that defendant JOSEPH LAFORTE, the leader of the team, was a twice-convicted felon. During this event, Abbonizio also misleadingly touted Par Funding's low default rate.

39. On or about September 20, 2019, defendant JOSEPH LAFORTE sent a text message to Par Funding's "reputation manager" instructing him to take actions to conceal negative information about defendant JOSEPH LAFORTE on the internet.

40. In or about November 2019, at a time when Victim Business No. 6 was financially unable to meet Par Funding's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 9 on the phone and told her: "Do you want to take this to the streets? We'll take this to the streets. I'm going to put a bomb in your car and when you turn it on, it's gonna blow and you're going to go with it."

41. Par Funding continued to collect repayments from Victim Business No. 6 after these threats were made until on or about February 4, 2020.

42. From in or about 2018 to in or about 2019, at a time when Victim Business 9 was financially unable to meet Par Funding's repayment terms, defendant JOSEPH LAFORTE spoke to Extortion Victim No. 12 by phone on several occasions and threatened to kill him, and also threatened to break his legs, if Extortion Victim No. 12 did not comply with defendant JOSEPH LAFORTE's repayment demands.

43.     Par Funding continued to collect repayments from Victim Business No. 9 after these threats were made.

44.     On or about November 21, 2019, at an event in King of Prussia, Pennsylvania, in which hundreds of investors and prospective investors were solicited to invest in Par Funding through Agent Funds, defendants JOSEPH LAFORTE and JOE COLE, Perry Abbonizio, and Person No. 1 made false and misleading representations regarding defendant JOSEPH LAFORTE and Par Funding.

45.     On or about November 22, 2019, defendants JOSEPH LAFORTE and JAMES LAFORTE telephoned a merchant-customer in default (identified above as Extortion Victim No. 10) and requested a small payment compared to the customer's large outstanding obligation to Par Funding to make it appear that the customer was not in default and to deceive Par Funding's auditors (and ultimately its investors).

46.     On or about December 5, 2019, defendant JOSEPH LAFORTE, in the presence of counsel for Par Funding, Attorney No. 1, lied under oath about defendant JOSEPH LAFORTE's involvement in, role at, and control over Par Funding during a deposition in a federal civil lawsuit pending against Par Funding.

47.     On or about December 18, 2019, defendant JOE COLE sent an email to defendant JOSEPH LAFORTE providing an update on discussions with Par Funding's insurance company.  In this email, defendant COLE suggested that Par Funding reduce its insurance "since the only benefit of" the insurance policy was that it permitted Agent Fund managers to "assert that our deals have insurance coverage."  Despite recognizing that this insurance provided no useful coverage to Par Funding, defendant COLE did not recommend that investors be notified,

49

but instead commented that Perry Abbonizio was "weaning the fund managers off the insurance pitch to investors."

48.     On or about December 19, 2019, defendant JOSEPH LAFORTE responded to defendant JOE COLE's email regarding insurance, agreeing to his suggestion that the amount of insurance be decreased so that Par Funding could still misleadingly promote its ineffective insurance, but for a lower cost.

49.     On or about January 3, 2020, defendant JOE COLE sent an email directing Person No. 4 to send a deceptive and circular payment designed to make it appear that merchant-customers that were in default were not in default.

50.     On or about January 7, 2020, during a meeting at Par Funding's offices in Philadelphia, Pennsylvania, Perry Abbonizio made false and misleading statements to a prospective investor who was actually acting in an undercover capacity regarding, among other things, defendant JOSEPH LAFORTE's role at the company, the company's underwriting process, and the company's default rate.

51.     On or about February 11, 2020, defendant JOE COLE, in the presence of Attorney No. 1, lied under oath about defendant JOSEPH LAFORTE's involvement in, role at, and control over Par Funding during a deposition in a federal civil lawsuit pending against Par Funding.

52.     On or about March 5, 2020, defendant JOSEPH LAFORTE, in the presence of Attorney No. 1, lied under oath about defendant JOSEPH LAFORTE's involvement in, role at, and control over Par Funding during a deposition in a federal civil lawsuit pending against Par Funding.

53.    On or about March 11, 2020, defendants JOSEPH LAFORTE and JOE COLE, along with Attorney No. 1, met with two company employees, Person No. 4 and Person No. 5, and coached them to lie about defendant JOSEPH LAFORTE's involvement in, role at, and control over Par Funding during an upcoming deposition in a federal civil lawsuit pending against Par Funding.

54.    On or about March 14, 2020, defendant JOSEPH LAFORTE and Perry Abbonizio caused Person No. 1 to remove any reference to defendant JOSEPH LAFORTE and his role at Par Funding from a promotional video that Person No. 1 had created.

55.    On or about March 27, 2020, defendant JAMES LAFORTE caused Par Funding to wire approximately $96,000 to a merchant-customer in a sham MCA agreement, which $96,000 was funneled to an entity controlled by defendant JAMES LAFORTE a few months later.

56.    On or about April 8, 2020, defendant JOSEPH LAFORTE caused defendant JAMES LAFORTE to pick up a cash kickback from Customer No. 1's assistant.

57.    On or about April 27, 2020, defendants JOSEPH LAFORTE and JAMES LAFORTE caused a fake MCA agreement to be created to disguise Par Funding's purchase of COVID-19 masks as an alleged MCA advance to the mask vendor.

58.    In or about April 2020, defendants JOSEPH LAFORTE and JOE COLE caused Par Funding and the Par Funding affiliates to submit misleading Form D filings to the SEC, stating, among other things, that the "Related Persons" of Par Funding were defendant LISA McELHONE, defendant JOE COLE, and/or Person No. 3, but omitting defendant JOSEPH LAFORTE, who was operating Par Funding and the Par Funding affiliates on a day-to-day basis.

59.     On or about May 26, 2020, defendants JOSEPH LAFORTE and JAMES LAFORTE caused Par Funding to pay defendant JAMES LAFORTE a "commission" of approximately $742,645 related to the purchase of COVID-19 masks disguised as an MCA agreement.

60.     On or about June 26, 2020, defendants JOSEPH LAFORTE and JOE COLE caused Attorney No. 1 to meet with two company employees, Person No. 4 and Person No. 5, to coach them to lie about defendant JOSEPH LAFORTE's involvement in, role at, and control over Par Funding during an upcoming deposition in a federal civil lawsuit pending against Par Funding.

61.     On or about June 29, 2020, defendants JOSEPH LAFORTE and JOE COLE and Attorney No. 1 caused Person No. 4 and Person No. 5 to lie under oath about defendant JOSEPH LAFORTE's involvement in, role at, and control over Par Funding during a deposition in a federal civil lawsuit pending against Par Funding.

62.     On or about July 10, 2020, defendant JOSEPH LAFORTE sent an email copying defendant JOE COLE, approving a deceptive and circular wire transfer designed to make it appear that a merchant-customer that was in default was not in default.

63.     On or about July 27, 2020, defendants JOSEPH LAFORTE and JAMES LAFORTE caused Par Funding to enter a fraudulent MCA agreement with Customer No. 1 to funnel approximately $750,000 to defendants JOSEPH LAFORTE and JAMES LAFORTE and Lisa McElhone.

64.     On or about July 28, 2020, during the execution of a federal search warrant at the accounting offices of Par Funding, defendant JOSEPH COLE falsely told the FBI

that the approximately $21,200 in cash that he had stored in his desk was money to pay Grubhub

for lunch, when in fact, as defendant COLE knew, it was money given to him at the direction of

defendant JOSEPH LAFORTE that had been earmarked to make fake MCA payments to Par

Funding designed to create the false appearance that various delinquent MCA customers were

not actually in default.

      65.    On or about June 2, 2021, defendant JOE COLE lied under oath about

defendant JOSEPH LAFORTE's involvement in, role at, and control over Par Funding during a

deposition in the SEC lawsuit pending against defendants COLE and JOSEPH LAFORTE, and

Lisa McElhone, and others.

      66.    On or about July 30, 2021, Person No. 2 caused approximately $900,000

of a civil settlement agreement with Par Funding's Customer No. 2—a customer in which

defendant JOSEPH LAFORTE had obtained an ownership interest through his nominees, which

at that time was Person No. 2—to be paid to an entity controlled by defendant JAMES

LAFORTE.

      67.    On or about August 29, 2022, defendant JAMES LAFORTE made a false

sworn, written statement that was attached and incorporated into a legal filing in the SEC lawsuit

by defendant JOSEPH LAFORTE and Lisa McElhone.  In his sworn declaration, defendant

JAMES LAFORTE attempted to hide the true source of the money used to pay defendant

JOSEPH LAFORTE and McElhone's attorneys. Defendant JAMES LAFORTE also attempted,

through this declaration, to hide defendant JOSEPH LAFORTE's role in diverting those funds

from the Receiver by falsely stating that the payments that he directed one of Customer No. 1's

Entities to make to these attorneys were "treated as partial payments" of an alleged $1.5 million

commission that Customer No. 1 purportedly owed to defendant JAMES LAFORTE regarding the COVID-19 mask deal.

68.     On or about November 28, 2022, defendant JOSEPH LAFORTE threatened to cause bodily injury to O.F. and O.F.'s wife if O.F. did not increase his valuations of a number of real estate properties that the Receiver had seized from defendant JOSEPH LAFORTE and Lisa McElhone during the course of the SEC lawsuit.

69.     On or about November 30, 2022, defendant JOSEPH LAFORTE met with O.F. to obtain the revised valuations described in paragraph 68, which valuations had been increased by O.F. following defendant JOSEPH LAFORTE's threats to O.F.

70.     On or about February 15, 2023, defendant JAMES LAFORTE used his cellphone to view an online article regarding Perry Abbonizio's guilty plea and to conduct a search regarding Abbonizio and one of Abbonizio's adult daughters, and then traveled to defendant JOSEPH LAFORTE's Haverford home the next morning.

71.     On or about the morning of February 26, 2023, defendants JAMES LAFORTE and JOSEPH LAFORTE were together at the Haverford home of defendant JOSEPH LAFORTE, after which defendant JAMES LAFORTE traveled to Philadelphia and spent time in the area around the home of one of Abbonizio's adult daughters.

72.     On or about February 28, 2023:

        a.     After spending the night at the Haverford home of defendant JOSEPH LAFORTE, defendants JAMES LAFORTE and JOSEPH LAFORTE left the Haverford home and drove separately to Philadelphia, where they met and spent several hours together, including a joint meeting with defendant JOSEPH LAFORTE's criminal defense counsel and a

visit to a Philadelphia clothing retailer from which, in the presence of defendant JOSEPH

LAFORTE, defendant JAMES LAFORTE quickly purchased a winter coat to change into later

for a planned attack of G.A.  Defendant JOSEPH LAFORTE then left the city and returned to his

Haverford home, while defendant JAMES LAFORTE remained in the city.

        b.        Defendant JOSEPH LAFORTE, his attorneys, and counsel for

other parties participated electronically in a video conference with the Florida district court judge

in the SEC lawsuit, during which G.A. addressed the Florida district court regarding the need for

defendant JOSEPH LAFORTE and Lisa McElhone to pay outstanding rent and other expenses to

the Receiver by March 3, 2023, or vacate their home in Haverford, Pennsylvania.

        c.        Approximately one minute after the conclusion of the video

hearing in the SEC lawsuit, defendant JOSEPH LAFORTE placed a phone call to defendant

JAMES LAFORTE, which lasted less than one minute.

        d.        Approximately six minutes after the phone call from defendant

JOSEPH LAFORTE, defendant JAMES LAFORTE moved into the area outside G.A.'s

Philadelphia office wearing the winter coat that he had purchased from the retailer hours earlier

while with JOSEPH LAFORTE, and not the winter coat that he was wearing earlier that day.

        e.        Approximately 30 minutes after moving into position to stalk G.A.

outside G.A.'s Philadelphia office, defendant JAMES LAFORTE assaulted and hospitalized

G.A. while G.A. was walking home from work, by striking G.A. on the head, from behind, with

a hard object.

        f.        Later that evening, defendant JOSEPH LAFORTE called

defendant JAMES LAFORTE, which call lasted approximately 6 minutes and 59 seconds, after

which defendant JOSEPH LAFORTE called defendant JAMES LAFORTE a second time, which call lasted approximately 14 minutes and 18 seconds.

73. On or about March 2, 2023:

a. In the morning, defendant JAMES LAFORTE left the Haverford home of defendant JOSEPH LAFORTE and traveled to Philadelphia to pick up his car, which had been in the Philadelphia parking garage since February 28, 2023, and then drove to Brooklyn, New York.

b. In the evening, defendant JAMES LAFORTE caused a telephone call to be placed to Perry Abbonizio and his wife using a "spoof" telephone number. The caller made several threatening statements to Abbonizio. For example, the caller told Abbonizio to "retract those lies or we're coming for the girls." The caller also referenced the streets on which Abbonizio's daughters reside in Philadelphia. The caller said something about "putting a guy in the hospital." At the time of this call, Abbonizio was a witness in the federal grand jury investigation and a party in his own criminal case.

c. Also in the evening, defendant JAMES LAFORTE caused a telephone call to be placed to one of Abbonizio's daughters, A.A., using the same "spoof" number. When A.A. answered the call, the male caller, who appeared to have a Staten Island or New York metropolitan area accent, told A.A. that he knew where she lived. The male called A.A. back soon afterwards and provided the street name upon which she lived and noted that she was Abbonizio's daughter.

d. Also that evening, defendant JAMES LAFORTE caused a telephone call to be placed to Extortion Victim No. 6, using the same "spoof" number. The

caller said, "We're coming after you.  We're going to split your head open you cunt."  At the time of this call, Extortion Victim No. 6 was a witness in the federal grand jury investigation and the SEC lawsuit.

74.     On or about March 3 and 4, 2023, defendant JAMES LAFORTE conducted internet searches on his cellphone related to his assault upon G.A.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNTS TWO THROUGH TWENTY
### (Wire fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50, and Overt Acts 3, 5 through 7, 11, 14, 15, 19, 21 through 29, 35, 37 through 39, 44 through 64, and 66 of Count One are incorporated here.

2.      From in or about early 2016 through in or about the middle of 2021, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

devised and intended to devise a scheme to defraud investors in Par Funding and the Par Funding affiliates, and the Agent Funds and to obtain money and property by means of knowingly false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

It was part of the scheme that:

3.      Paragraphs 54 through 94 of Count One are incorporated here.

### WIRINGS

4.      On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

for the purpose of executing the scheme described above, caused to be transmitted by means of

wire communication in interstate commerce the signals and sounds described below, each

transmission constituting a separate offense:

| Count | Appx. Date | Description |
|---|---|---|
| 2 | 7/25/18 | Email from Par Funding representative to Agent Fund manager and Perry Abbonizio with misleading marketing brochure |
| 3 | 11/8/18 | Email from defendant JOSEPH LAFORTE to Person No. 4 regarding manipulating Par Funding's write-offs |
| 4 | 12/20/18 | Conference call among defendant JOSEPH LAFORTE, Perry Abbonizio, Person No. 1, and various Agent Fund managers |
| 5 | 12/20/18 | Email from Perry Abbonizio to Agent Fund manager, forwarding email from Person No. 2 attaching misleading letter in response to a news article |
| 6 | 1/8/19 | Email from Par Funding representative to Agent Fund managers with misleading marketing brochure |
| 7 | 2/14/19 | Email from defendant JOE COLE to defendant JOSEPH LAFORTE regarding Par Funding's misleading Form D filing |
| 8 | 8/1/19 | Email from defendant JOSEPH LAFORTE to Person No. 4 regarding manipulating Par Funding's write-offs |
| 9 | 9/14/19 | Text message from defendant JOSEPH LAFORTE to the reputation manager regarding "do[ing] something w[ith] [his] google related searches," as "[i]t has Gino and the Bloomberg article" |
| 10 | 9/16/19 | Email from defendant JOSEPH LAFORTE to the reputation manager selecting an article for the deceptive publicity campaign |
| 11 | 9/20/19 | Text message from defendant JOSEPH LAFORTE to the reputation manager complaining that his "google search has Bloomberg first and doj second" and instructing the reputation manager to "[g]et this shit fixed" |

| Count | Appx. Date | Description |
|-------|-----------|-------------|
| 12 | 9/21/19 | Text message from the reputation manager to defendant JOSEPH LAFORTE regarding a deceptive publicity campaign |
| 13 | 11/22/19 | Telephone call from defendant JOSEPH LAFORTE and JAMES LAFORTE to Extortion Victim No. 10 |
| 14 | 11/23/19 | Text message from defendant JOSEPH LAFORTE to the reputation manager stating an article about his federal conviction was "hurting [his] business reputation" and asking what could be done |
| 15 | 12/18/19 | Email from defendant JOE COLE to defendant JOSEPH LAFORTE regarding various issues, including insurance |
| 16 | 4/8/20 | Text message from defendant JOSEPH LAFORTE to Customer No. 1's assistant about defendant JAMES LAFORTE picking up a cash kickback |
| 17 | 4/27/20 | Email from defendant JOE COLE to defendant JOSEPH LAFORTE and others regarding new fundings |
| 18 | 7/27/20 | Email notifying Par Funding, copying Person No. 5, that Customer No. 1 viewed an MCA agreement |
| 19 | 7/27/20 | Email notifying Par Funding, and defendant JAMES LAFORTE, that Customer No. 1 signed an MCA agreement |
| 20 | 7/27/20 | Telephone call between defendant JOSEPH LAFORTE and Customer No. 1 regarding a fraudulent MCA agreement |

All in violation of Title 18, United States Code, Section 1343.

<u>**COUNT TWENTY-ONE**</u>
(Securities fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.       Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, 34 through 50, and 54 through 93, and Overt Acts 3, 5 through 7, 11, 14, 15, 19, 21 through 29, 35, 37 through 39, 44 through 64, and 66 of Count One are incorporated here.

2.       From in or about early 2016 through in or about the middle of 2021, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a Joe McElhone,**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, and aiding and abetting same, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of securities in Par Funding and various Agent Funds that invested in Par Funding.

All in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b–5, and Title 18, United States Code, Section 2.

## COUNT TWENTY-TWO
(Collection of extensions of credit by extortionate means)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 of Count One are incorporated here.

2.      Renato Gioe, charged elsewhere, worked for the collections department for Par Funding and, at the direction of defendant JOSEPH LAFORTE, acted as an "enforcer" and used extortionate means, including express and implied threats of violence, to collect payments from its customers.

3.      Defendant JAMES LAFORTE performed work for defendant JOSEPH LAFORTE at Par Funding in a variety of roles, including by identifying merchant-customers to whom Par Funding would make MCA advances.  Defendant JAMES LAFORTE, with the knowledge and direction of defendant JOSEPH LAFORTE, also acted as an "enforcer" and used extortionate means, including express and implied threats of violence, to collect payments from Par Funding's customers.

4.      FAF was one of the Par Funding affiliates.  Throughout this conspiracy, FAF's MCAs were underwritten, funded, and collected by the same staff at Par Funding and for all practical purposes functioned as the same entity as Par Funding.

5.      Renato Gioe worked for Par Funding from approximately 2013 through 2018 as a contractor for the company's collections department.  During this time, Gioe worked out of Par Funding's Philadelphia offices, where he reported to and took direction from defendant JOSEPH LAFORTE.  Gioe performed this work through a limited liability company

formed in Delaware called Stern Group & Associates.  Defendant JOSEPH LAFORTE played a direct role in setting up Stern Group & Associates.

6. Par Funding's collections department was responsible for collecting funds from merchant-customers who did not make their payments on time.  Defendants JOSEPH LAFORTE and JAMES LAFORTE, and Renato Gioe at defendant JOSEPH LAFORTE's direction, contacted delinquent borrowers via phone calls, text messages, and personal visits to their homes and businesses to make express and implied threats of violence to the merchant-customers and their families, such as threats to stick a fork in a merchant-customer's head or to cut off the merchant-customer's hands.  The collections department also used various other techniques to harass delinquent merchant-customers, including by making repeated phone calls and emails to representatives of the merchant-customers, as well as the merchant-customers' family members, friends, neighbors, religious organizations, and schools.

7. From no later than in or about 2016 until at least in or about July 2020, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

knowingly conspired and agreed with Renato Gioe and others, known and unknown to the grand jury, to participate in the use of extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from multiple merchant-customers, including Extortion Victim No. 1, Extortion Victims No. 2 and 3, Extortion

Victim No. 4, Extortion Victim No. 5, Extortion Victims No. 6 and 7, Extortion Victims No. 8 and 9, Extortion Victim No. 10, Extortion Victim  No. 11, and Extortion Victim No. 12, all persons known to the grand jury, in violation of Title 18, United States Code, Section 894(a).

## MANNER AND MEANS

It was part of the conspiracy that:

8.      Paragraphs 94 through 97 of Count One are incorporated here.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its object, defendants JOSEPH LAFORTE and JAMES LAFORTE, along with Renato Gioe and others both known and unknown to the grand jury, committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1.      Overt Acts 4, 8 through 11, 12, 13, 16 through 18, 20, 30 through 34, 36, 40 through 43, and 45 of Count One are incorporated here.

All in violation of Title 18, United States Code, Section 894(a).

## COUNT TWENTY-THREE
(Collection of extensions of credit by extortionate means)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, 32, 34 through 50, and 94 through 97 and Overt Act 4 of Count One and paragraphs 2 through 6 of Count Twenty-Two are incorporated here.

2.     From in or about early 2016 through on or about September 16, 2019, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

and Renato Gioe, charged elsewhere, knowingly used, and aided and abetted the use of, extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from Extortion Victim No. 1, a person known to the grand jury.

In violation of Title 18, United States Code, Sections 894(a) and 2.

**COUNT TWENTY-FOUR**
(Collection of extensions of credit by extortionate means)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.　　Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, 32, 34 through 50, and 94 through 97 and Overt Acts 9 through 10 of Count One and paragraphs 2 through 6 of Count Twenty-Two are incorporated here.

2.　　From in or about February 2018 through on or about July 10, 2020, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

and Renato Gioe, charged elsewhere, knowingly used, and aided and abetted the use of, extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from Extortion Victim Nos. 2 and 3, persons known to the grand jury.

In violation of Title 18, United States Code, Sections 894(a) and 2.

## COUNT TWENTY-FIVE
(Collection of extensions of credit by extortionate means)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, 32, 34 through 50, and 94 through 97 and Overt Acts 16 through 18 of Count One and paragraphs 2 through 6 of Count Twenty-Two are incorporated here.

2.      From in or about June 2018 through in or about April 2019, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

and Renato Gioe, charged elsewhere, knowingly used, and aided and abetted the use of, extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from Extortion Victim No. 5, a person known to the grand jury.

In violation of Title 18, United States Code, Sections 894(a) and 2.

## COUNT TWENTY-SIX
(Collection of extensions of credit by extortionate means)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50, and 94 through 97 and Overt Acts 33 and 34 of Count One and paragraphs 2 through 6 of Count Twenty-Two are incorporated here.

2. In or about May 2019, in the Eastern District of Pennsylvania, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

knowingly used extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from Extortion Victims Nos. 6 and 7, persons known to the grand jury.

In violation of Title 18, United States Code, Section 894(a).

## COUNT TWENTY-SEVEN
(Collection of extensions of credit by extortionate means)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, 32, 34 through 50, and 94 through 97 and Overt Acts 30, 31, 36, 40, and 41 of Count One and paragraphs 2 through 6 of Count Twenty-Two are incorporated here.

2.      From in or about February 2019 through in or about February 2020, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

knowingly used extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from Extortion Victim Nos. 8 and 9, persons known to the grand jury.

In violation of Title 18, United States Code, Section 894(a).

## COUNT TWENTY-EIGHT
(Collection of extensions of credit by extortionate means)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, 32, 34 through 50, and 94 through 97 and Overt Acts 12, 13, 20 and 45 of Count One and paragraphs 2 through 6 of Count Twenty-Two are incorporated here.

2.     From in or about May 2018 through in or about November 2019, in the Eastern District of Pennsylvania and elsewhere, defendant

**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

knowingly used extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from Extortion Victim No. 10, a person known to the grand jury.

In violation of Title 18, United States Code, Section 894(a).

## COUNT TWENTY-NINE
(Collection of extensions of credit by extortionate means)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, 32, 34 through 50, and 94 through 97 and Overt Act 32 of Count One and paragraphs 2 through 6 of Count Twenty-Two are incorporated here.

2.      From in or about March 2019 through in or about March 2020, in the Eastern District of Pennsylvania and elsewhere, defendant

**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

knowingly used extortionate means within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect extensions of credit from Extortion Victim No. 11, a person known to the grand jury.

In violation of Title 18, United States Code, Section 894(a).

## COUNT THIRTY
(Evasion of assessment)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50, 66 through 70, 75, 80, 81, 86, 87, and 90 of Count One are incorporated here.

2.      Defendant JOSEPH LAFORTE did not file federal tax returns for tax years 2014 through 2017.

3.      Customer No. 1 sought and received an MCA from Par Funding for one of his companies ("MCA Company No. 1") in or about May 2015 and received additional MCAs from Par Funding and the Par Funding affiliates for MCA Company No. 1 and other related entities that he owned (Customer No. 1's Entities).  Some of the additional MCAs that Customer No. 1 obtained later in 2015 for Customer No. 1's Entities were "reload" agreements that extended money to these entities for the purpose of repaying these entities' previous MCAs.  As a result, the payments that Customer No. 1's Entities owed to Par Funding and the Par Funding affiliates became unsustainable.

4.      Due to Customer No. 1's inability to make these payments, in or about early 2016 defendant JOSEPH LAFORTE offered to extend additional and higher amount MCAs to Customer No. 1's Entities if Customer No. 1 would agree to pay defendant JOSEPH LAFORTE cash kickbacks equal to approximately 10% of all money extended to Customer No. 1's Entities by Par Funding and the Par Funding affiliates.  Customer No. 1 agreed to this offer.

5.      As a result, from in or about early 2016 through in or about mid-2020, Customer No. 1 made regular cash kickback payments to defendant JOSEPH LAFORTE and

defendant JAMES LAFORTE, charged elsewhere in this second superseding indictment, on his brother's behalf.

6.      Over this period, the MCA balance for Customer No. 1's Entities increased from approximately $1.4 million in early 2016 to approximately $92 million in mid-2020 through numerous new and reload MCA agreements.

7.      Due to this kickback arrangement, defendant JOSEPH LAFORTE received hundreds of thousands of dollars of taxable income during the calendar year 2017, upon which there was an income tax due and owing to the United States of America.

8.      From on or about January 1, 2017, through on or about April 15, 2018, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

a resident of Haverford, Pennsylvania, willfully attempted to evade and defeat an income tax due and owing by him to the United States of America for the calendar year 2017 by failing to make an income tax return on or about April 15, 2018, as required by law, to any proper officer of the Internal Revenue Service, and by failing to pay to the Internal Revenue Service this income tax, and by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income through various means, including, among other things:

a.      by causing Customer No. 1 to make payments in cash directly to defendant JOSEPH LAFORTE that were not recorded on the books of Par Funding or the Par Funding affiliates; and

b.      by causing Par Funding and the Par Funding affiliates to enter new and reload MCA agreements with Customer No. 1's Entities without undertaking adequate underwriting.

In violation of Title 26, United States Code, Section 7201.

## COUNTS THIRTY-ONE THROUGH THIRTY-TWO
(Making, subscribing, and filing a false return)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50, 66 through 70, 75, 80, 81, 86, 87, and 90 and Overt Act 23 of Count One, and paragraphs 2 through 7 of Count Thirty are incorporated here.

2.     For tax years 2018 and 2019, defendant JOSEPH LAFORTE and Lisa McElhone approved and signed federal tax returns using IRS Form 1040s, in which they elected the filing status of "married filing jointly." These tax returns were prepared by Accountant No.1 and Accountant No. 2.

3.     On or about August 15, 2019, defendant JOSEPH LAFORTE and his wife, Lisa McElhone, filed an individual income tax return, Form 1040, for tax year 2018, electing "married filing jointly" status. On this return, defendant JOSEPH LAFORTE did not report any income. In addition, defendant JOSEPH LAFORTE did not report any of the cash kickbacks that he received from Customer No. 1, even though he received millions of dollars in cash kickbacks in 2018 from Customer No. 1.

4.      On or about October 17, 2019, defendant JOSEPH LAFORTE and his wife, Lisa McElhone, filed an amended individual income tax return, Form 1040X, for tax year 2018, electing "married filing jointly" status. On this joint return, defendant JOSEPH LAFORTE did not report any income, including any of the cash kickbacks that he received from Customer No. 1.

5.     On or about July 15, 2020, defendant JOSEPH LAFORTE and his wife, Lisa McElhone, filed an individual income tax return, Form 1040, for tax year 2019, electing

"married filing jointly" status. On this joint return, defendant JOSEPH LAFORTE did not report

any income. In addition, defendant JOSEPH LAFORTE did not report any of the cash kickbacks

that he had received from Customer No. 1, even though he had received millions of dollars in

cash kickbacks in 2019 from Customer No. 1.

6. On or about the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

willfully made and subscribed and filed and caused to be filed with the Internal Revenue Service

the following false United States individual income tax returns, in the name of defendant

JOSEPH LAFORTE and his wife, Lisa McElhone, charged elsewhere, for the calendar years set

forth below, which were verified by a written declaration that they were made under the penalties

of perjury, which defendant JOSEPH LAFORTE did not believe to be true and correct as to

every material matter. The tax returns reported the married couple's income without including

the substantial cash payments that defendant JOSEPH LAFORTE received from Customer No.

1, when, as defendant JOSEPH LAFORTE knew, he had received substantial income in the form

of these cash payments from Customer No. 1 in each of these calendar years, each false tax

return constituting a separate count:

| Count | Approximate Filing Date | Year | Form | False Item(s) |
|-------|------------------------|------|------|---------------|
| 31 | 10/17/19 | 2018 | 1040X | Schedule 1, Line 21, Other income<br>Schedule 1, Line 22<br>Form 1040, Line 6, Total income<br>Form 1040X, Line 1, Adjusted gross income, columns a and c |
| 32 | 7/15/20 | 2019 | 1040 | Schedule 1, Line 8, Other income<br>Schedule 1, Line 9<br>Form 1040, Line 7a, Other income<br>Form 1040, Line 7b, Total income |

All in violation of Title 26, United States Code, Section 7206(1).

## COUNTS THIRTY-THREE THROUGH FORTY-FOUR
(Failure to collect and pay over tax)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50, 54, and 67(e) of Count One and paragraphs 2 through 7 of Count Thirty are incorporated here.

At all times material to this second superseding indictment:

2.  Full Spectrum Processing was a corporation doing business in Philadelphia, Pennsylvania. Full Spectrum Processing was engaged in the business of providing back-office support to Par Funding and the Par Funding affiliates.

3.  Defendant JOSEPH LAFORTE functioned as the Chief Executive Officer and President of Full Spectrum Processing, Par Funding, and the Par Funding affiliates and owned these entities through his nominees, including Lisa McElhone, charged elsewhere. Defendant JOSEPH LAFORTE ran the day-to-day operations of these companies, and the Chief Financial Officer of these companies, defendant JOE COLE, charged elsewhere in this second superseding indictment, reported to defendant JOSEPH LAFORTE. Among other things, defendant JOSEPH LAFORTE decided what underwriting processes would be taken before funding, which MCA transactions would be funded, and what collections activities would be taken. In addition, Perry Abbonizio, charged elsewhere, the consultant in charge of fundraising for Par Funding, reported to defendant JOSEPH LAFORTE.

4.  The IRS was an agency of the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

5.     Pursuant to the Internal Revenue Code and associated statutes and regulations, employers are required to withhold amounts from their employees' gross pay including Federal Insurance Contribution Act ("FICA") taxes, which represent Social Security and Medicare taxes, and federal income taxes.  Employers were required to remit these taxes (referred to in this second superseding indictment collectively as "trust fund taxes" because employers hold the withheld amounts in trust until paid over to the United States) to the IRS on a quarterly basis, no later than the last day of month following the end of the quarter.

6.     In addition to the trust fund taxes that must be withheld from pay, employers are separately required to make contributions under FICA for Social Security and Medicare in amounts matching the amounts withheld from their employees' pay for those purposes.  Such employer contributions are likewise required to be remitted to the IRS no later than the last day of the month following the end of the quarter.  Collectively, these five components required to be remitted quarterly were commonly referred to as "employment taxes," made up of the trust fund taxes withheld (individual income, Social Security, and Medicare taxes) and the matching amounts contributed by the employer.

7.     Employers are required to file, one month after the conclusion of the calendar quarter, an Employer's Quarterly Federal Tax Return, Form 941 ("Form 941"), setting forth the total amount of income taxes withheld, the total amount of Social Security and Medicare taxes due, and the total tax deposits.

8.     A person was responsible for collecting, accounting for, and paying over the employment taxes if he or she had the authority required to exercise significant control over the employer's financial affairs, regardless of whether the individual exercised such control in

fact. More than one person may be considered a "responsible person" for the purpose of collecting, accounting for, and paying over employment taxes, including trust fund amounts and employers' matching amounts.

9.       Defendant JOSEPH LAFORTE exercised control over Full Spectrum Processing's financial affairs by, among other acts, approving payments, controlling bank accounts, and supervising the payroll manager; thus, defendant JOSEPH LAFORTE was a responsible person for collecting trust fund taxes, accounting for the employment taxes by filing Forms 941 with the IRS, and paying over to the IRS the employment taxes for Full Spectrum Processing's employees.

10.      Defendant JOSEPH LAFORTE was a person required to collect, account for on quarterly Forms 941, and pay over to the IRS on behalf of Full Spectrum Processing the trust fund taxes imposed on its employees by the Internal Revenue Code.

11.      From at least in or about early 2017 through at least in or about March 2020, defendant JOSEPH LAFORTE, and his agents working at his direction, made cash wage payments to Full Spectrum Processing employees on a regular basis.

12.      From at least in or about early 2017 through at least in or about March 2020, despite making regular cash payments to Full Spectrum Processing employees, defendant JOSEPH LAFORTE caused Full Spectrum Processing to record these employees' wages without including the amount of these cash payments. Defendant JOSEPH LAFORTE also caused Full Spectrum Processing not to collect the required trust fund taxes from these cash wages.

13.      As a result, from at least in or about early 2017 through at least in or about early 2020, defendant JOSEPH LAFORTE caused Full Spectrum Processing to file quarterly

employment tax returns, Forms 941, that failed to truthfully account for the wages paid to its employees and caused Full Spectrum Processing to fail to pay over all of the trust funds taxes due and owing to the IRS on behalf of its employees.

14. On or about the dates listed in the table below, for each of the calendar quarters listed below, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

willfully failed to collect, truthfully account for, and pay over the trust fund taxes due and owing to the IRS on behalf of the employees of Full Spectrum Processing, each quarter constituting a separate count:

| Count | Date of Offense (i.e., Date for Filing of Form 941) | Calendar Quarter Ending |
|-------|-----------------------------------------------------|-------------------------|
| 33 | April 30, 2017 | March 30, 2017 |
| 34 | July 31, 2017 | June 30, 2017 |
| 35 | October 31, 2017 | September 30, 2017 |
| 36 | January 31, 2018 | December 31, 2017 |
| 37 | April 30, 2018 | March 30, 2018 |
| 38 | July 31, 2018 | June 30, 2018 |
| 39 | October 31, 2018 | September 30, 2018 |
| 40 | January 31, 2019 | December 31, 2018 |
| 41 | April 30, 2019 | March 30, 2019 |
| 42 | July 31, 2019 | June 30, 2019 |
| 43 | October 31, 2019 | September 30, 2019 |
| 44 | January 31, 2020 | December 31, 2019 |

All in violation of Title 26, United States Code, Section 7202.

## COUNT FORTY-FIVE
### (Perjury)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 99 and Overt Acts 1 through 64 of Count One, Counts Two through Twenty, Twenty-Two, and paragraphs 2 through 7 of Count Thirty, are incorporated here.

2. On or about February 15, 2018, several plaintiffs filed a civil complaint against Par Funding, another entity, and various unnamed individuals, alleging, among other things, fraud, RICO violations, civil conspiracy, and breach of contract. The complaint was filed in the United States District Court for the Eastern District of Pennsylvania and was captioned: *Fleetwood Services, LLC, Robert L. Fleetwood, and Pamela A. Fleetwood vs. Complete Business Solutions Group, Inc. d/b/a Par Funding; Prime Time Funding; John and Jane Does* and docketed at Civil Action No. 18-CV-268.

3. On or about December 5, 2019, in a proceeding ancillary to the civil action referred to in paragraph 2 of this Count, defendant JOSEPH LAFORTE gave an oral deposition under oath in accordance with the Federal Rules of Civil Procedure, during which he was represented by counsel for Par Funding, Attorney No. 1.

4. At the oral deposition, defendant JOSEPH LAFORTE was asked a series of questions regarding his work and involvement with Par Funding (i.e., CBSG), as well as the involvement of others, including his wife, at the company.

5. It was a matter material to the litigation to determine who was operating and responsible for the business activities of Par Funding.

6.      It was also important to the defendants named in Count One of this second superseding indictment to continue concealing defendant JOSEPH LAFORTE's ownership and control of Par Funding from the outside world, in furtherance of the conspiracy described in Count One.

7.      On or about December 5, 2019, in Philadelphia, in the Eastern District of Pennsylvania, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

while under oath in a proceeding in the United States District Court for the Eastern District of Pennsylvania, that is, a deposition, knowingly made false declarations, underlined below, in response to questions asked to him with respect to the material matter as described in paragraph 5 of this Count as follows:

Q.      Do you have an ownership interest in CBSG?

A.      I don't.

Q.      Have you ever had an ownership interest in CBSG?

A.      No.

Q.      Have you ever represented to anyone in the public that you are an owner of CBSG?

A.      No.  Not that I know of, no.

Q.      Have you ever represented to an investor or potential investor that are you are an owner of CBSG?

A.     No, sales director.

                    * * *

Q.     Okay. Is your wife currently an employee of CBSG?

A.     Yes.

Q.     Has she always been an employee of CBSG since it was founded?

A.     Yes.

Q.     Does she have a title at CBSG?

A.     I don't know what her title is at CBSG.  We're not really big on titles like

       you guys are here, so I don't really think she has a title.

Q.     Do you know if she's an officer or director of CBSG?

A.     I don't know.

                    * * *

Q.     Okay, and as the person that runs the sales side of CBSG, are you familiar

       with CBSG's annual funding?

A.     No.

Q.     Do you know how much money CBSG has funded this year, for instance?

A.     No.

Q.     Do you know how many accounts receivable CBSG has outstanding

       currently, ballpark?

A.     No.

                    * * *

Q.     Who is CBSG's CFO?

A.    I'm not sure who it is.  I am not sure who is in that capacity right now.

Q.    Who is the last CFO that you do know worked in that capacity for CBSG?

A.    I couldn't say who the last one was.

Q.    Do you know who Joe Cole is?

A.    Yeah, sure.

Q.    Is Joe Cole the current CFO?

A.    I wouldn't know.

Q.    What is your understanding as to what Mr. Cole does for CBSG?

A.    I wouldn't know.  I work for Recruiting and Marketing Resources.  They keep me in another business.  Their operations have nothing to do with me.

* * *

Q.    Have you ever been an officer of CBSG?

A.    No.

Q.    Ever been a director of CBSG?

A.    No.

Q.    Ever been an employee of CBSG?

A.    No.

Q.    Ever been an owner of CBSG?

A.    No.

Q.    Have you ever received any form of profits that were generated by CBSG?

A.    No.

Q.    Have you ever hired or fired any employees of CBSG?

A.    <u>No.</u>

\* \* \*

Q:    Does CBSG keep statistics on default rates?

A:    <u>I don't know.</u>

Q:    Do you have any idea what CBSG's current default rate is?

A:    <u>I wouldn't know.</u>

Q:    Do you know what CBSG's default rate was in 2018?

A:    <u>No.</u>

Q:    What about 2017?

A:    <u>No.</u>

8.    The underlined testimony of defendant JOSEPH LAFORTE, as set forth in paragraph 7 of this Count, as defendant JOSEPH LAFORTE then well knew and believed, was false, in that defendant JOSEPH LAFORTE knew at the time he made these statements that:

a.    he had represented to investors, potential investors, and others that he was an owner of CBSG, i.e., Par Funding;

b.    his wife's title at Par Funding was President;

c.    he was familiar with Par Funding's annual funding, i.e., the dollar amount of MCA transactions that Par Funding funded on an annual basis;

d.    he could provide an estimate of Par Funding's outstanding accounts receivable;

e.   defendant JOE COLE, charged elsewhere in this second

superseding indictment, held the title of Chief Financial Officer

("CFO") at Par Funding and reported to defendant JOSEPH

LAFORTE;

f.   he had received profits that were generated from Par Funding;

h.   he had hired and fired employees of Par Funding; and

i.   he was aware that Par Funding kept default rates statistics, he knew

its current default rate and its default rates in 2017 and 2018, and

he made representations to investors and potential investors in Par

Funding regarding the company's allegedly low default rate.

In violation of Title 18, United States Code, Section 1623.

## COUNT FORTY-SIX
(Perjury)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 99 and Overt Acts 1 through 64 of Count One, Counts Two through Twenty, Twenty-Two, and paragraphs 2 through 7 of Count Thirty, are incorporated here.

2.      On or about July 26, 2019, plaintiffs filed a civil action against Par Funding and FAF, alleging fraud, RICO violations, conspiracy, and breach of contract. The complaint was filed in the United States District Court for the Eastern District of Pennsylvania and was captioned: *HMC Inc. and Kara DiPietro v. CBSG d/b/a Par Funding and Fast Advance Funding*, and docketed at Civil Action No. 19-CV-3285.

3.      On or about March 5, 2020, in a proceeding ancillary to the civil action referred to in paragraph 2 of this Count, defendant JOSEPH LAFORTE gave an oral deposition under oath in accordance with the Federal Rules of Civil Procedure, during which he was represented by counsel for Par Funding, Attorney No. 1.

4.      At the oral deposition, defendant JOSEPH LAFORTE was asked a series of questions regarding the business activities of Par Funding and the work and involvement of defendant JOSEPH LAFORTE, as well as defendant JOE COLE, charged elsewhere in this second superseding indictment, and Lisa McElhone, charged elsewhere.

5.      It was a matter material to the litigation to determine who was operating and responsible for the business activities of Par Funding.

6.      It was also important to the defendants charged in Count One of this second superseding indictment to continue concealing defendant JOSEPH LAFORTE's

ownership and control of Par Funding from the outside world, in furtherance of the conspiracy described in Count One of this indictment.

7.     On or about March 5, 2020, in Philadelphia, in the Eastern District of Pennsylvania, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

while under oath in a proceeding the United States District Court for the Eastern District of Pennsylvania, that is, a deposition, knowingly made false declarations, underlined below, in response to questions asked to him with respect to the material matter as described in paragraph 5 of this Count as follows:

Q:     Was CBSG providing merchant cash advances to businesses in 2019?

A:     I don't know.

                    * * *

Q.     In 2018, what role – strike that.  In 2019, what role did Lisa McElhone have in CBSG?

A:     I don't know.

Q:     Was Lisa McElhone the president of CBSG in 2019?

A:     I don't know.

Q:     Did Ms. McElhone work for CBSG in any capacity in 2019?

A:     I don't know anything about any of these questions about CBSG.  I don't work for CBSG.  I work for Recruiting and Marketing Resources.

         \* \* \*

Q.     Can you please let me know whether you know whether your wife, Lisa

McElhone, had any involvement with CBSG in 2019.

A.     <u>No.</u>

Q.     You don't know or she didn't?

A.     <u>I don't know any answers to these questions about Par Funding/CBSG.</u>

Q.     Did your wife own any businesses in 2019?

A.     <u>I don't know what she owns and doesn't own.</u>

         \* \* \*

Q.     Okay.  You ever hear of a company called Lacquer Lounge?

A.     No, I never heard of Lacquer Lounge.

Q.     Is there a hair salon or nail salon that your wife does own?  I may have the

name wrong.

A.     Yeah, the name is Lacquer Lounge.  Don't ask me ridiculous questions.

You're wasting time.  She owns a nail salon in Old City.

Q.     When did she purchase the nail salon --

A.     I don't know.

Q.     – in Old City?

A.     <u>I don't know her business.</u>

Q.     If you could please try to let me --

A.     We have a very --

Q.     -- ask my questions.

A.      We have a very private business relationship.  She doesn't tell me about her business.  I don't tell her my business.  We have a very loving, beautiful relationship, two dogs and a house.  We don't talk business.

                                        * * *

Q.      What is CBSG's default rate in 2019?

A.      I don't know.

Q.      Have you ever represented to any investor or potential investor that CBSG's default rate is 1 to 2 percent?

A.      I don't remember.

Q.      Do you know if anyone in your presence acting on behalf of CBSG has represented that CBSG's default rate is 1 to 2 percent?

A.      I don't remember.

Q.      What is CBSG default rate?

A.      I don't know.

Q.      Do you know if it's higher or lower than 1 to 2 percent?

A.      I don't know.  I don't work there.  Are you looking to invest in the company, asking me what the default rate is?

                                        * * *

Q.      What employee do you personally know at the company?

A.      I don't know.

Q.      Can you think of anyone other than Ms. Lau?

A.      No.

Q.      Does Mr. Cole work for CBSG?

A.      <u>I don't know.</u>

8.      The underlined testimony of defendant JOSEPH LAFORTE, as set forth in paragraph 7 of this Count, as defendant JOSEPH LAFORTE then well knew and believed, was false, in that defendant JOSEPH LAFORTE knew at the time he made these statements that:

    a.      Par Funding had extended MCAs to businesses in 2019;

    b.      defendant JOSEPH LAFORTE had represented to investors, potential investors, and others that he was an owner of CBSG, i.e., Par Funding;

    c.      his wife's title at Par Funding was President;

    d.      defendant JOE COLE held the title of Chief Financial Officer ("CFO") at Par Funding and reported to defendant JOSEPH LAFORTE; and

    e.      Par Funding kept default rates statistics, he knew its current default rate and its default rates in 2019, and he made representations to investors and potential investors in Par Funding regarding the company's allegedly low default rate.

In violation of Title 18, United States Code, Section 1623.

# COUNT FORTY-SEVEN
(Perjury)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 99 and Overt Acts 1 through 64 of Count One, Counts Two through Twenty, Twenty-Two, and paragraphs 2 through 7 of Count Thirty, are incorporated here.

2. On or about February 11, 2020, in a proceeding ancillary to the civil action referred to in paragraph 2 of Count Forty-Five, defendant JOE COLE gave an oral deposition under oath in accordance with the Federal Rules of Civil Procedure, during which he was represented by counsel for Par Funding, Attorney No. 1. Pursuant to Federal Rule of Civil Procedure 30(b)(6), defendant COLE served as a corporate representative of Par Funding.

4. At the oral deposition, defendant JOE COLE was asked a series of questions regarding the underwriting and approval process of an MCA, including the role of the credit committee of Par Funding, which provided final approval for the terms of the MCA.

5. It was a matter material to the litigation to determine who served on the credit committee of Par Funding.

6. It was also important to the defendants charged in Count One of this second superseding indictment to continue concealing defendant JOSEPH LAFORTE's ownership and control of Par Funding from the outside world, in furtherance of the conspiracy described in Count One of this indictment.

7.     On or about February 11, 2020, in Philadelphia, in the Eastern District of Pennsylvania, defendant

**JOSEPH COLE BARLETA,**
**a/k/a Joe Cole**,

while under oath in a proceeding in the United States District Court for the Eastern District of Pennsylvania, that is, a deposition, knowingly made false declarations, underlined below, in response to questions asked to him with respect to the material matter as described in paragraph 5 of this Count as follows:

Q.     When was the credit committee formed?

A.     Near inception when we first started.

Q.     When did you first start?

A.     The end of 2012.

Q.     Can you tell me the names of the individuals that were originally on the credit committee for CBSG at the formation of the company?

A.     Yes.  Credit committee was Lisa.

Q.     Lisa who?

A.     McElhone.  [Person No. 3].

Q.     Anyone else?

A.     <u>No.</u>

Q.     Has anyone -- strike that.  Has the composition of the credit committee changed since that time?

A.     Yes.

Q.    When did it change, and how did it change?

A.    It changed a few times.  We had different employees some in. [sic]

Q.    Can you tell me some of the other individuals that were on the credit committee and what periods of time they served?

A.    We had [S.G.] as part of the credit committee, that was approximately from 2013 to 2017.

Q.    Was she on the committee with [Lisa McElhone] and [Person No. 3]?

A.    Yes.

Q.    Okay.  About how about [after S.G.] left?

A.    [V.V.] took over.  They had some overlap, she was part of the credit committee.  [V.V.] has been with us since 2014, I believe, and promoted to that position after two years.

Q.    Is she still on the credit committee?

A.    Yes.

Q.    Is anyone else on the credit committee other than those three women?

A.    Yes.

Q.    Who else?

A.    [A.S.]

Q.    How do you spell [A.S.]'s last name?

A.    [A.S.]

Q.      Okay.  When did she get appointed to the committee?

A.      That was about two years ago.

Q.      Okay.  Anyone else?

A.      <u>No.</u>

8.      The underlined testimony of defendant JOE COLE, as set forth in paragraph 7 of this Count, as defendant COLE then well knew and believed, was false, in that defendant COLE knew at the time he made these statements that defendant JOSEPH LAFORTE had served on and in fact ran and controlled the credit committee of Par Funding since its inception.

In violation of Title 18, United States Code, Section 1623.

<h1 style="text-align:center"><strong><u>COUNT FORTY-EIGHT</u></strong></h1>
(Perjury)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.	Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 99 and Overt Acts 1 through 64 of Count One, Counts Two through Twenty, Twenty-Two, and paragraphs 2 through 7 of Count Thirty, are incorporated here.

2.	On or about June 30, 2020, in a proceeding ancillary to the civil action referred to in paragraph 2 of Count Forty-Six, defendant JOE COLE gave an oral deposition under oath in accordance with the Federal Rules of Civil Procedure, during which he was represented by counsel for Par Funding, Attorney No. 1.  Pursuant to Federal Rule of Civil Procedure 30(b)(6), defendant COLE served as a corporate representative of Par Funding, charged elsewhere in this second superseding indictment.

3.	At the oral deposition, defendant JOE COLE was asked a series of questions regarding his work and involvement with Par Funding, as well as the involvement of others, including defendant JOSEPH LAFORTE, charged elsewhere in this second superseding indictment.

4.	It was a matter material to the litigation to determine who was operating and responsible for the business activities of Par Funding.

5.	It was also important to the defendants charged in Count One of this second superseding indictment to continue concealing defendant JOSEPH LAFORTE's ownership and control of Par Funding from the outside world, in furtherance of the conspiracy described in Count One.

6.      On or about June 30, 2020, in Philadelphia, in the Eastern District of

Pennsylvania, defendant

**JOSEPH COLE BARLETA**
**a/k/a Joe Cole**,

while under oath in a proceeding in the United States District Court for the Eastern District of

Pennsylvania, that is, a deposition, knowingly made false declarations, underlined below, in

response to questions asked to him with respect to the material matter as described in paragraph

4 of this Count as follows:

Q.      Who is CBSG management?

A.      <u>That is myself as CFO, Lisa [McElhone] as president and [Person</u>
        <u>No. 3] as treasurer.</u>

            * * *

Q.      And does Mr. LaForte have any managerial responsibilities over
        CBSG through his relationship with Full Spectrum?

A.      No.

[Attorney]: Objection.

            * * *

Q.      Does Mr. LaForte do anything on behalf of Full Spectrum for
        CBSG?

A.      No.

Q.      Does Mr. LaForte have any involvement in CBSG?

A.      He works through our sales entity.

Q.      What's that?

A.      Recruiting and Marketing Resources.

Q.      Okay.  And does Mr. LaForte, through Recruiting and Marketing
        Resources, have any managerial responsibilities of CBSG?

[Attorney]: Objection.

A.      <u>No.</u>

Q.      No?  Does Mr. LaForte have any responsibility for CBSG?

[Attorney]: Objection.

A.      <u>No.</u>

Q.      Through any entity?

A.      <u>No.</u>

* * *

Q.      Got it.  Is there anyone other than Lisa who makes decisions on
        behalf of CBSG?

[Attorney]: Objection.

A:      <u>No.</u>

Q:      She's the sole decision maker?

A.      No.  Directors and myself, [Person No. 3] and her.

Q.      Well, I just asked you if there's anyone else who makes decisions
        on behalf of CBSG and you said no.

A.      I'm not sure what you meant.

Q.      Okay.  So --

A.      <u>The directors of the company are Lisa, myself and [Person No. 3].</u>

<u>Those are the only decision makers in the business.</u>  We do have

departments, and it depends on how granular you want to get about

decisions, you know.

Q.      She has -- she has ultimate say, correct?

A.      <u>Of course.</u>

7.      The underlined testimony of defendant JOE COLE, as set forth in

paragraph 6 of this Count, as defendant COLE then well knew and believed, was false, in that

defendant COLE knew at the time he made these statements that defendant JOSEPH LAFORTE

made decisions on behalf of Par Funding, ran the day-to-day operations of Par Funding, and had

the "ultimate say" regarding the decisions of Par Funding.

In violation of Title 18, United States Code, Section 1623.

## COUNT FORTY-NINE
(Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 99 and Overt Acts 1 through 64 of Count One, and Counts Forty-Five through Forty-Eight are incorporated here.

2.     From on or about July 26, 2019, through no earlier than on or about June 30, 2020, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone," and**
**JOSEPH COLE BARLETA**
**a/k/a Joe Cole,**

and Attorney No. 1, corruptly obstructed, influenced, and impeded an official proceeding, that is, a civil action pending against defendant JOSEPH LAFORTE, Par Funding, and others in the United States District Court for the Eastern District of Pennsylvania, captioned *HMC Inc. and Kara DiPietro v. CBSG d/b/a Par Funding and Fast Advance Funding*, docketed at Civil Action No. 19-CV-3285, by testifying falsely at the depositions of defendants JOSEPH LAFORTE and JOE COLE in that proceeding, and by coaching, encouraging, and otherwise directing two Par Funding employees, Person No. 4 and Person No. 5, to testify falsely at their depositions in that proceeding, and aiding and abetting same.

In violation of Title 18, United States Code, Sections 1512(c)(2) and 2.

**COUNT FIFTY**
(Conspiracy to obstruct justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 100 of Count One are incorporated here.

At all times material to this second superseding indictment:

2.      By in or about 2020, a federal grand jury investigation into the activities of defendants JOSEPH LAFORTE, JAMES LAFORTE, and JOE COLE, charged elsewhere in this second superseding indictment, as well as Lisa McElhone and Par Funding, charged elsewhere, and others, had been opened in the Eastern District of Pennsylvania (the "federal grand jury investigation").

3.      In connection with the federal grand jury investigation, on or about July 28, 2020, federal law enforcement officers executed search warrants at Par Funding's principal places of business, located at 20-22 N. 3rd Street, Philadelphia, Pennsylvania, and 205 Arch Street, Philadelphia, Pennsylvania, as well as at the residence and vacation homes of defendant JOSEPH LAFORTE and Lisa McElhone.  The affidavit in support of the applications for these search warrants described the probable cause that defendants JOSEPH LAFORTE and JAMES LAFORTE, and Lisa McElhone, and others committed various federal criminal violations, including securities fraud, extortionate collection of credit, and tax crimes.  Among the sources of information cited in this affidavit was Extortion Victim No. 6, the principal of Victim Business No. 5, a merchant-customer of Par Funding.

4.      On or about August 5, 2020, a grand jury in the Eastern District of Pennsylvania charged defendant JOSEPH LAFORTE by indictment with violating 18 U.S.C. §

922(g) for being a felon-in-possession of multiple firearms recovered during the search of his primary residence. Following the filing of these charges, as part of its disclosure obligations, the government provided defendant JOSEPH LAFORTE with a copy of the affidavit in support of the application for the search warrants, which included information that Extortion Victim No. 6 had provided as a witness.

5. From at least in or about July 2020 through in or about May 2023, the federal grand jury for the Eastern District of Pennsylvania continued investigating, among other things, securities fraud, extortionate collection of credit, and tax crimes.

6. Meanwhile, in or about November 2021, defendant JOSEPH LAFORTE and Lisa McElhone settled with the SEC in the SEC lawsuit, and in or about November 2022, the district court ordered them to pay approximately $142,529,980 in disgorgement, $10,694,758 in interest, and $43,700,000 in civil penalties.

7. On or about February 15, 2023, as a result of an ongoing federal grand jury investigation, Perry Abbonizio, charged elsewhere, entered a guilty plea pursuant to an information in the Eastern District of Pennsylvania before United States District Court Judge Mark A. Kearney for violation of 18 U.S.C. § 371 (conspiracy), *United States v. Perry Abbonizio*, Crim. No. 23-10 (E.D. Pa.). Abbonizio admitted, under oath, to conspiring with defendant JOSEPH LAFORTE, and others, to commit wire fraud and securities fraud in connection with Par Funding. Abbonizio was a consultant for Par Funding who, using the title Principal, was responsible for a significant amount of the company's fundraising efforts from 2016 through mid-2020.

8.      On or about February 28, 2023, defendant JOSEPH LAFORTE, his attorneys, and counsel for other parties participated electronically in a video conference with the Florida district court judge in the SEC lawsuit, during which G.A. addressed the Florida district court regarding the need for defendant JOSEPH LAFORTE and Lisa McElhone to pay outstanding rent and other expenses to the Receiver by March 3, 2023, or vacate their home in Haverford, Pennsylvania.

## THE CONSPIRACY

9.      From on or about no later than February 15, 2023, through on or about March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

conspired and agreed to commit an offense against the United States, namely, endeavoring to influence, obstruct, and impede the due administration of justice in official proceedings, that is, the federal grand jury investigation in the Eastern District of Pennsylvania and the SEC lawsuit in the Southern District of Florida, by threats and by force, in violation of Title 18, United States Code, Section 1503(a).

## MANNER AND MEANS

It was party of the conspiracy that:

10.      Paragraphs 101 through 102 of Count One are incorporated here.

**OVERT ACTS**

1.      Overt Acts 70 through 74 of Count One are incorporated here.

All in violation of Title 18, United States Code, Section 371.

## COUNT FIFTY-ONE
(Obstruction of justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 100 and Overt Acts 1 through 69 of Count One and paragraphs 2 through 6 of Count Fifty are incorporated here.

2.      From on or about November 16, 2022, through on or about November 30, 2022, in the Eastern District of Pennsylvania, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

corruptly and by threat and force endeavored to influence, obstruct, and impede the due administration of justice in the ongoing federal lawsuit by the SEC in the Southern District of Florida, by threatening to cause serious bodily injury to O.F.

In violation of Title 18, United States Code, Section 1503(a).

## COUNT FIFTY-TWO
(Obstruction of proceedings)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 102 and Overt Acts 1 through 74 of Count One and paragraphs 2 through 8 of Count Fifty are incorporated here.

2.      From on or about February 15, 2023, through on or about March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

corruptly and by threats and force endeavored to influence, obstruct, and impede the due and proper administration of the law in a proceeding being had before a department or agency of the United States, that is, an ongoing SEC enforcement action involving Par Funding and other parties, by causing serious bodily injury to G.A., a Philadelphia attorney, and by threats of force to Extortion Victim No. 6, a witness in the SEC enforcement action, and aiding and abetting same.

In violation of Title 18, United States Code, Sections 1505 and 2.

(Obstruction of justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 102 and Overt Acts 1 through 74 of Count One and paragraphs 2 through 8 of Count Fifty are incorporated here.

2.     From on or about February 15, 2023, through on or about March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

corruptly attempted to obstruct, influence, and impede an official proceeding, that is, an anticipated criminal prosecution in the Eastern District of Pennsylvania of defendants JOSEPH LAFORTE and JAMES LAFORTE, as well as Lisa McElhone, charged elsewhere, by causing serious bodily injury to G.A., a Philadelphia attorney, and causing threats of violence against witnesses and parties to this proceeding with threats of force and reference to the recent attack upon G.A., and aiding and abetting same.

In violation of Title 18, United States Code, Sections 1512(c)(2) and 2.

## COUNT FIFTY-FOUR
(Tampering)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 102 and Overt Acts 1 through 74 of Count One and paragraphs 2 through 8 of Count Fifty are incorporated here.

2. From on or about February 15, 2023, through on or about March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

used and attempted to use physical force and the threat of physical force against persons, that is, G.A., Perry Abbonizio, and Perry Abbonizio's daughters, by causing serious bodily injury to G.A., a Philadelphia attorney, and causing threatening calls to be made to Perry Abbonizio, his wife, and his daughters, and aiding and abetting same, with the intent to influence, delay, and prevent the testimony of Perry Abbonizio in, and to cause and induce Perry Abbonizio to withhold testimony from, an official proceeding, that is, the federal grand jury investigation in the Eastern District of Pennsylvania.

In violation of Title 18, United States Code, Sections 1512(a)(2)(A), (B)(i) and 2.

## COUNT FIFTY-FIVE
### (Tampering)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 102 and Overt Acts 1 through 74 of Count One and paragraphs 2 through 8 of Count Fifty are incorporated here.

2. From on or about February 15, 2023, through on or about March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

used and attempted to use physical force and the threat of physical force against persons G.A. and Extortion Victim No. 6 by causing serious bodily injury to G.A., a Philadelphia attorney, and causing a threatening call to be made to Extortion Victim No. 6, and aiding and abetting same, with the intent to influence, delay, and prevent the testimony of Extortion Victim No. 6 in, and to cause and induce Extortion Victim No. 6 to withhold testimony from, an official proceeding, that is, the federal grand jury investigation in the Eastern District of Pennsylvania.

In violation of Title 18, United States Code, Sections 1512(a)(2)(A), (B)(i) and 2.

## COUNT FIFTY-SIX
(Tampering)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 100 and Overt Acts 1 through 69 of Count One and paragraphs 2 through 6 of Count Fifty are incorporated here.

2.      From on or about November 16, 2022, through on or about November 30, 2022, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**

used and attempted to use the threat of physical force against a person, O.F., with the intent to influence, delay, and prevent the testimony of O.F. in, and to cause and induce O.F. to withhold testimony, records, and documents from, an official proceeding, that is, the federal lawsuit by the SEC in the Southern District of Florida.

In violation of Title 18, United States Code, Section 1512(a)(2)(A), (B)(i).

**COUNT FIFTY-SEVEN**
(Retaliation)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 102 and Overt Acts 1 through 74 of Count One and paragraphs 2 through 8 of Count Fifty are incorporated here.

2.      From on or about February 15, 2023, through on or about March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

knowingly engaged in conduct which caused bodily injury to G.A., a Philadelphia attorney, and aiding and abetting same, with the intent to retaliate against Par Funding, the Receiver for Par Funding ("Receiver"), and G.A. for the attendance of Par Funding and the Receiver at an official proceeding, and for the testimony and records produced by Par Funding and the Receiver at an official proceeding, that is, the federal lawsuit by the SEC in the Southern District of Florida.

In violation of Title 18, United States Code, Sections 1513(b)(1) and 2.

## COUNT FIFTY-EIGHT
(Retaliation)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 102 and Overt Acts 1 through 74 of Count One and paragraphs 2 through 8 of Count Fifty are incorporated here.

2.      From on or about February 15, 2023, through on or about March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendant

**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

knowingly threatened to engage in conduct which would cause bodily injury to Perry Abbonizio and his family members, with the intent to retaliate against Abbonizio for the attendance of Abbonizio at official proceedings, and for the testimony and records produced by Abbonizio at official proceedings, that is, (i) the federal grand jury investigation in the Eastern District of Pennsylvania and (ii) the criminal case *United States v. Perry Abbonizio*, Crim. No. 23-10 (E.D. Pa.).

In violation of Title 18, United States Code, Section 1513(b)(1).

## COUNT FIFTY-NINE
### (Retaliation)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 3 through 15, 20, 21, 23, 25, 27, 30, and 32, and 34 through 50 and 53 through 102 and Overt Acts 1 through 74 of Count One and paragraphs 2 through 8 of Count Fifty are incorporated here.

2.  From on or about February 15, 2023, through on or about March 6, 2023, in the Eastern District of Pennsylvania and elsewhere, defendant

**JAMES LAFORTE,**
**a/k/a Jimmy Schillaci,"**

knowingly threatened to engage in conduct which would cause bodily injury to Extortion Victim No. 6, with the intent to retaliate against Extortion Victim No. 6 for the testimony and records produced by Extortion Victim No. 6 at official proceedings, that is, (i) the federal grand jury investigation in the Eastern District of Pennsylvania and (ii) the ongoing federal lawsuit by the SEC in the Southern District of Florida.

In violation of Title 18, United States Code, Section 1513(b)(1).

# NOTICE OF FORFEITURE NO. 1

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Section 1962(d), set forth in this second superseding indictment, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

shall forfeit to the United States:

a.      any property that the defendants have acquired and maintained interests in, in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b.      any property that the defendants have an interest in, security of, claims against, and property and contractual rights which afford a source of influence over, the enterprise named and described herein which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2);

c.      any property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

2.      The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3), include, but are not limited to at least $416,395,484 and all interests and proceeds traceable thereto, including but not limited to the following assets:

a.      One (1) Cessna Citation Sovereign 680 with Tail Number N789MJ;

b.      All funds in Charles Schwab account #xxxx-7878 in the name of Tradewinds South, LLC;

c.      A parcel of land located at 1745 Walnut Green Road, Wilmington, DE 19807; and

d.      A parcel of land located at 1751 Walnut Green Road, Wilmington, DE 19087.

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the Court;

   d.  has been substantially diminished in value; or

   e.  has been commingled with other property which cannot be divided

     without difficulty;

the court shall order the forfeiture of any other property of the defendants up to the value of any

property set forth in paragraph 1a-c above.

   All pursuant to Title 18, United States Code, Section 1963.

## <u>NOTICE OF FORFEITURE NO. 2</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.     As a result of the violations of Title 18, United States Code, Sections 371 and 1343 and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, set forth in this second superseding indictment, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone,"**
**JOSEPH COLE BARLETA,**
**a/k/a "Joe Cole," and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses, including, but not limited to:

         a.     Fund up to the amount of $416,395,484 (forfeiture money judgment);

         b.     One (1) Cessna Citation Sovereign 680 with Tail Number N789MJ;

         c.     All funds in Charles Schwab account #xxxx-7878 in the name of Tradewinds South, LLC;

         d.     A parcel of land located at 1745 Walnut Green Road, Wilmington, DE 19807; and

         e.     A parcel of land located at 1751 Walnut Green Road, Wilmington,

DE 19087.

2.     If any of the property described above, as a result of any act or omission of the defendants:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred to, sold to, or deposited with a third party;

        c.      has been placed beyond the jurisdiction of this Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

## <u>NOTICE OF FORFEITURE NO. 3</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     As a result of the violations of Title 18, United States Code, Section 894(a), set forth in this second superseding indictment, defendants

**JOSEPH LAFORTE,**
**a/k/a "Joe Mack,"**
**a/k/a "Joe Macki,"**
**a/k/a "Joe Mackie,"**
**a/k/a "Joe McElhone, and**
**JAMES LAFORTE,**
**a/k/a "Jimmy Schillaci,"**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations.

2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

**A TRUE BILL:**

_____
**FOREPERSON**

_____
**JACQUELINE C. ROMERO**
**UNITED STATES ATTORNEY**