**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 23-198-5 |
| v. | : | |
| | : | |
| JAMES LAFORTE | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

In broad daylight on the afternoon of February 28, 2023, defendant James "Jimmy" LaForte brutally assaulted an attorney tasked by the court with unraveling his family's $400 million fraud scheme. The unprovoked attack was premediated and retaliatory; after lying in wait for his victim to emerge from his Center City law office, Jimmy LaForte ambushed him from behind, leaving the attorney bloodied and in need of 7 staples to his scalp. Two days later, Jimmy LaForte turned to terrorizing Par Funding's other perceived enemies through a string of menacing, threatening calls to government witnesses and their family members.

By all accounts, defendant Jimmy LaForte was an unpolished and undisciplined blunt object wielded by his older brother, co-defendant Joseph LaForte, to further the illicit goals of the Par Funding enterprise. When merchant-debtors fell behind on their payments, Jimmy LaForte served as one of his brother's enforcers and used threats of violence to collect on Par Funding's debt. From retaliatory threats to pure violence, Jimmy LaForte's calloused dirty work ensured his family always came out on top, without regard to the financial, mental, and physical harm caused to his victims.

There is little to nothing about Jimmy LaForte's violent offenses, characteristics, or personal history—which include prior convictions for conspiracies to commit arson and extortion, running an illegal gambling operation, and an extensive fraud and money laundering

scheme—that warrant sympathy from the Court. The only mitigating factors in this sentencing are the defendant's ongoing health concerns and his subservient role as a violent bagman plied by superiors in furtherance of their own reprehensible ends.

The parties have presented a "C plea" range of 110 to 137 months' imprisonment for Jimmy LaForte, which mirrors his advisory guidelines range, and is a step below the sentencing range proposed for Joseph LaForte, the leader of the Par Funding racketeering conspiracy and the most culpable defendant. Only a sentence at the very top of this range will hold Jimmy LaForte fully accountable for the severity of his crimes while bringing an appropriate level of justice to his victims. For the reasons that follow, the government asks this Court to sentence James LaForte to imprisonment of 11 years and 5 months.

## I.    INTRODUCTION AND BACKGROUND

Jimmy LaForte is charged in an amended second superseding indictment returned on February 26, 2024,[1] which charges the defendant, his brother Joseph LaForte, and Par Funding's Chief Financial Officer Joseph Cole Barleta with racketeering conspiracy and related crimes in connection with a criminal enterprise that ran an investment vehicle known as Complete Business Solutions Group, Inc., d/b/a Par Funding ("Par Funding") for a number of years before it was taken over by a court-appointed receivership pursuant to a lawsuit filed by the U.S. Securities and Exchange Commission ("SEC"). Crim No. 23-198.

On January 21, 2025, the Court found the Par Funding fraud scheme caused an actual fraud loss of approximately $404,000,000, which it reduced to $288,395,088 after factoring in credit for collateral seized from Par Funding by federal authorities when the investigation went

---

[1] The original indictment in this case was returned on May 18, 2023.

2

overt in July 2020. ECF 309. As outlined below, defendant Jimmy LaForte is not accountable for the entire Par Funding fraud loss. Unlike his co-defendants, he was not investor-facing and did not directly cause investor losses through misrepresentations or cooking the books to hide Par Funding's financial troubles. The defendant instead is appropriately held responsible for the financial losses that he caused as part of the conspiracy, which amounts to $2,488,645. This actual loss figure represents the portion of investor proceeds that the defendant illegally diverted from Par Funding's numerous investors for his own use through sham merchant contracts and other self-dealing conduct.

The government and the defendant entered into a written plea agreement that resolves the charges.[2] As the Court knows, the plea agreement contains a provision under Federal Rule of Criminal Procedure 11(c)(1)(C), wherein the parties have agreed to a proposed sentence of imprisonment for the convictions in the range of 110 to 137 months, followed by no more than three years of supervised release. After expressing reservations, the Court conditionally accepted Jimmy LaForte's guilty plea at the request of the parties following a hearing on September 11, 2024, but the Court expressly reserved judgment on whether to accept or reject the proposed plea after receipt and review of the Final Presentence Investigation Report and parties' Sentencing Memoranda.

Defendant LaForte's final Presentence Investigation Report ("PSR") was issued on February 26, 2025. Sentencing is scheduled for March 13, 2025.

---

[2] The defendant pled guilty to racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 1); securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5 (Count 21); extortionate collection of debt, in violation of 18 U.S.C. § 894(a) (Count 29); obstruction of justice, in violation of 18 U.S.C. § 1505 (Count 52); and retaliation, in violation 18 U.S.C. § 1513(b)(1) (Count 58).

3

II.    **FACTS OF CONVICTION**

A.    **The RICO Conspiracy and the Fleecing of Par Funding Investors**

Co-defendant Joseph LaForte led a years-long criminal enterprise consisting of, at various times, himself, his family members (including the defendant), and co-defendant Cole Barleta, as well as Perry Abbonizio, charged elsewhere, and other persons known but not identified in the indictment. Joseph LaForte served as the enterprise's undisputed leader and Cole Barleta and Jimmy LaForte served as his loyal lieutenants. The principal purpose of this enterprise was to generate money for its leadership and members, primarily by defrauding the investors in Par Funding, which the enterprise controlled until the SEC intervened in July 2020. Joseph LaForte was wildly successful in achieving his illicit goal: from 2015 until the unraveling of the fraud in mid-2020, Joseph LaForte caused Par Funding to pay him and his wife more than $120,000,000 in fraudulent proceeds, while also rewarding the loyalty of the defendant, Cole Barleta, and Abbonizio by making each of them multi-millionaires.

The investor-fraud portion of the criminal enterprise was run by Joseph LaForte, Cole Barleta, and Abbonizio,[3] who caused Par Funding to issue securities in the form of promissory notes to its many investors, including agent funds, and caused these agent funds to issue promissory notes to additional investors. These notes promised investors the return of their

---

[3] Unlike his co-conspirators, defendant Jimmy LaForte did not make misrepresentations to (or even interact with) Par Funding's investors. The defendant's role in the investor fraud portion of the criminal enterprise was largely limited to his few (but significant) episodes of self-dealing and enriching himself with investor funds through sham merchant contracts and paying himself bogus commissions for worthless business deals, to the detriment of Par Funding's investors.

capital plus an additional amount of money as interest. All told, the defendants' co-conspirators raised approximately $550,000,000 from their investors during the life of the scheme. PSR ¶ 48.

Par Funding's stated use of these investor funds was to "advance" them to businesses (known as merchant cash advance or "MCA" customers) that were in need of money but which could not obtain funding from traditional sources, and then to generate income by charging these cash-strapped businesses exorbitant rates of return. *See* PSR ¶¶ 32-34.[4]  The problem was that many of these MCA customers were already circling the drain of bankruptcy or financial insolvency by the time they started taking cash advances from Par Funding, meaning they ultimately defaulted on their repayment obligations. To help maintain the appearance of financial success and profitability, Joseph LaForte routinely caused Par Funding to "reload," "rollover," or "refinance" a failing MCA business with additional cash advances that the failing business would then use, in part, to pay back the original advance. *See* PSR ¶¶ 33, 77, 84. This practice buried the MCA customer further and further in debt to the degree that repayment became virtually impossible, while leaving these businesses dependent on taking larger and larger advances from Joseph LaForte's MCA empire. *Id*. The defendant was aware of and participated in some of the efforts to artificially inflate Par Funding's financial health; in a recorded phone call made on November 22, 2019, for example, he and co-defendant Joseph LaForte telephoned victim C.K.—who was in default on his obligation to repay a cash advance made to his company—and demanded a small payment compared to the customer's large outstanding

---

[4] The enterprise tasked the defendant with finding merchant customers in need of funding and giving them merchant cash deals, for which he was paid a commission. The defendant pressured Par Funding's underwriting team to fund risky deals to financially unstable customers in order to generate more commission for himself, which co-defendant Joseph LaForte allowed to happen.

balance to make it appear that the customer was not in default and to deceive Par Funding's auditors (and ultimately its investors).

Despite the reality that many of these MCA customers were either failing or were destined for failure (leaving Par Funding on the hook for the large amounts of money it had advanced), Joseph LaForte and Cole Barleta manipulated the financial disclosures shared with investors to falsely and misleadingly project that Par Funding had hundreds of millions of dollars of active and collectible MCA advances.

The reality hidden from Par Funding's investors was that during every year from 2016 through mid-2020, Par Funding's MCA business was not profitable enough to repay the money owed to Par Funding's investors while also covering its operating expenses (including the tens of millions of dollars the defendants were paying themselves annually). In other words, Joseph LaForte needed to acquire increasingly large injections of new investor money just to keep the lights on and the business running, a hallmark of a traditional Ponzi scheme.[5]

Joseph LaForte, Cole Barleta, and Abbonizio lied about virtually every aspect of the supposed health and success of Par Funding's MCA business to induce their victims to invest in Par Funding and its affiliate entities. They hid from their investors (as well as the SEC) the fact that the business was being run by "Joe Mack" (a/k/a Joseph LaForte), a twice-convicted felon who previously pled guilty to conspiring to steal more than $12,000,000 in connection with a mortgage closing scheme. *See* PSR ¶¶ 66-69. They lied about the supposed rigor of Par Funding's underwriting process for funding MCA customers, which Par Funding's employees admitted was in shambles by no later than 2019. PSR ¶ 70. They lied about the supposed small

---

[5] Per the testimony of Melissa Davis at the fraud loss evidentiary hearing.

business size and diversity of the business's stable of MCA customers despite the reality (as set forth above) that roughly half of this business consisted of only five customers, four of which had posted year-after-year negative net income. PSR ¶¶ 71-73. They lied about the alleged 1% "default rate" of their MCA customers, which they compared to the purported 25% default rate of Par Funding's MCA competitors, and they manipulated their business's accounting records to make it falsely appear that many non-paying MCA customers were not actually in default. PSR ¶¶ 74-79. And they lied about the value and validity of an insurance policy they obtained for Par Funding, which they told investors guaranteed and protected their investment, but which the defendants eventually learned was worthless. PSR ¶¶ 82-83.

The enterprise and its leadership allowed the defendant to enrich himself to the detriment of Par Funding's investors, which information was withheld from these investors. For example, in May 2020 the defendant and co-defendant Joseph LaForte caused Par Funding to pay the defendant an approximate $742,645 "commission" in May 2020 for non-CDC approved COVID-19 masks purchased with money that Par Funding advanced to a merchant-customer, but which was never repaid. In June 2020, the defendant created a fake $96,000 cash advance contract with an alleged merchant customer who then funneled the money back into the defendant's bank account. And in July 2020, when the enterprise learned that SEC intervention was imminent, the defendant helped co-defendant Joseph LaForte to wire approximately $750,000 of Par Funding investor money to a friendly merchant-customer via a fake cash advance contract and then order that customer to wire this money to co-defendant Joseph LaForte's former civil attorneys and a bank account controlled by the defendant.

The defendant also helped co-defendant Joseph LaForte receive the large cash kickbacks that one of the primary merchant-customers routinely paid to Joseph LaForte, which cash was never recorded in Par Funding's business and accounting records or disclosed to the company's investors. On several occasions the defendant personally retrieved large amounts of this cash kickbacks from this customer and his associates, on behalf of his brother.

**B.      The Defendant's Extortion of MCA Customers**

When Joseph LaForte and Par Funding's collection team were unable to collect money from their MCA customers through lawful channels, the defendant and others under LaForte's direction resorted to direct or implied threats of violence to shake-down delinquent MCA customers and induce repayment. PSR ¶¶ 92-127.

The defendant personally threatened several MCA customers, including victim C.K., whose business had fallen behind on its payment terms with Par Funding. In an effort to extract additional funds, the defendant threatened C.K. on multiple occasions, including by telling C.K. that he (the defendant) was not a person to be trifled with because the defendant had experience with torching cars and kicking people's teeth in, and that he would have C.K. and his 8-year-old son killed. The defendant also threatened to knock C.K.'s teeth out and break his face if C.K. did not pay $10,000 per week. PSR ¶¶ 120-23. The defendant similarly threatened victim J.P. after his business had fallen in arrears with Par Funding. The defendant's threats included repeatedly telling J.P. that the defendant would kill J.P. and his family if he did not pay Par Funding. PSR ¶¶ 124-26.

C.    **The Defendant's Assault of G.A.**

Defendant Jimmy LaForte did not merely threaten violence; he actually perpetrated it in further of the racketeering conspiracy. On February 28, 2023, Jimmy LaForte committed the brazen, broad daylight assault of G.A., an attorney working on behalf of the court-appointed receivership.[6] In the years preceding this attack, G.A. and the rest of the receivership had dutifully and methodically clawed back tens of millions of dollars of ill-gotten assets and property from Joseph LaForte and his family, for the benefit of Par Funding's defrauded investors. As part of those efforts, by February 2023 G.A. and his team were in the process of evicting Joseph LaForte and Lisa McElhone from the Haverford estate they had purchased with Par Funding proceeds.

Jimmy LaForte spent the night before the attack at Joseph LaForte's Haverford estate. On the morning of the attack, the LaForte brothers drove separate cars into Center City, where they joined up and then met together with Joseph LaForte's former criminal defense attorney before hanging out in a cigar lounge a few blocks from the eventual scene of the crime. Joseph LaForte then escorted his brother to a youth clothing store where Jimmy LaForte purchased a spare winter coat (he was already wearing a winter coat) that he would don as a thin disguise a few hours later while assaulting G.A. After leaving the clothing store, Joseph LaForte helped his

---

[6] During the course of the SEC's enforcement action against co-defendant Joseph LaForte and Cole Barleta, among others, the court-appointed Receiver retained Philadelphia attorney G.A. to help unravel the Par Funding fraud scheme and seize fraudulently obtained assets. Although the defendant was not a named party to the SEC lawsuit, he clearly followed the case closely: the defendant submitted a sworn declaration in support of his brother's defense, the defendant texted an associate to "do research on receiver," and the defendant's handwritten diary included a message to his newborn son that "Me and uncle Joe [LaForte] are putting things back together. You will see we are fighting the SEC and government – We'll talk about that when your ready."

brother move his car from the street to a parking garage where the car would remain until several days after the attack. Joseph LaForte then left his brother in the city and drove himself back to his Haverford home.

Once he arrived home, Joseph LaForte logged onto a virtual court hearing among the parties and lawyers in the receivership matter, including G.A. Immediately after the conclusion of this hearing, Joseph LaForte called his brother to let him know the hearing had ended so that Jimmy LaForte could move into position to stalk G.A. outside of his Center City Philadelphia law office, a few blocks from where Joseph LaForte had left the defendant a few hours earlier. Jimmy LaForte then walked to a location near G.A.'s office and lurked there for approximately 30 minutes until G.A. emerged, at which point Jimmy LaForte struck him from behind with a hard object, hospitalizing G.A. and requiring him to receive seven staples to his scalp at the Emergency Room. PSR ¶¶ 136-38. That evening, Joseph called and spoke with the defendant at length twice, for a total of 21 minutes. The following day, James LaForte traveled to his brother's Haverford estate and spent the night there.

### D.    The Defendant's Threats Against Government Witnesses

On the evening of March 2, 2023, two days after the assault upon G.A., the defendant called co-conspirator Perry Abbonizio[7] and Abbonizio's wife multiple times between 8 and 9 p.m. using an untraceable "spoof" telephone number and anonymously threatened Abbonizio to "retract those lies or we're coming for the girls," and then referenced the streets on which

---

[7] Approximately two weeks prior, on February 15, 2023, Abbonizio pled guilty to an information charging him with conspiring with Joseph LaForte, Lisa McElhone, and others to commit securities and wire fraud in connection with Par Funding's investment efforts. At this hearing, which was reported in the Philadelphia media, Abbonizio testified under oath that he agreed with the government's factual recitation supporting his guilty plea.

Abbonizio's adult daughters lived in Philadelphia. The defendant also talked about "putting a guy in the hospital," which was an apparent reference to his attack on G.A. a couple days earlier. The defendant then used the same "spoof" number to make two anonymous calls to Abbonizio's adult daughters between 8 and 9 p.m. in which he told one of them that he knew that she was Abbonizio's daughter and that he knew where she lived, and then referenced the street upon which she lived. PSR ¶¶ 139-40.

On the same evening of March 2, 2023, K.D., a merchant customer of Par Funding, a plaintiff in a lawsuit against Par Funding, and a witness in the SEC case and in the ongoing criminal case, also reported to the FBI that at approximately 8:48 p.m., she received a threatening telephone call. The number that made the call was the exact same "spoof" number that contacted the Abbonizios, and the call was made around the same time as the defendant's threatening calls to the Abbonizios. K.D. told the FBI that the caller repeated her name multiple times before stating "We're coming after you. We're going to split your head open . . . ." An index card seized from the defendant's person at the time of his arrest a few days later contained the first name and cellphone number of K.D., along with the names and phone numbers of the Abbonizios. PSR ¶ 141.

## III.    ADVISORY GUIDELINES CALCULATION

### A.    Criminal History Score

The defendant's PSR noted correctly that James LaForte has ten criminal history points from four prior convictions. PSR ¶¶ 207-12. These ten criminal history points place James LaForte into criminal history category V. PSR ¶ 213.

B.    **Advisory Guidelines Calculation**

Probation also correctly calculated the defendant's offense level and advisory guideline range. Joseph LaForte's RICO conspiracy guidelines calculation is driven primarily by the fraud loss of $2,488,645 caused when he diverted investor funds for his own use; this actual fraud loss amount means that the defendant's base offense level of 7 is increased by 16 additional levels. PSR ¶ 180-81; USSG § 2B1.1(b)(1)(I). Probation then correctly applied a 2-level enhancement for defrauding more than 10 victims,[8] and a 2-level enhancement for obstruction of justice, for an adjusted offense level of 27. PSR ¶¶ 182-85. Additionally, James LaForte's other crimes of conviction create two additional sentencing groupings, which add two additional levels to his total offense level, bringing his combined adjusted offense level to 29. PSR ¶¶ 187-202.[9]

Finally, James LaForte's total offense level drops to 26 after subtracting 3 levels for acceptance of responsibility and a timely guilty plea. An offense level of 26 with a criminal history category of V puts James LaForte's advisory guideline at 110 to 137 months'

---

[8] The defendant lodged an objection to the enhancement for defrauding more than 10 victims. Although he was not investor facing, and not part of Par Funding's fraudulent sales pitch or doctored accounting records, the defendant nevertheless caused harm to numerous investor victims when he created fake MCA contracts and illegally siphoned their money for his personal use. PSR at 62 (response to defense Obj. No. 1).

[9] Although the government views the defendant's violent and threatening conduct to be his most serious offenses, his sentencing guidelines range is not driven by the obstruction guidelines of USSG § 2J1.2, but by the fraud loss guidelines of USSG § 2B1.1(b)(1), which produce the highest offense level for the RICO conspiracy offense group. PSR ¶¶ 176-77, 180-86. Due to enhancements and grouping analysis, the defendant's violent conduct in furtherance of the RICO conspiracy does add 4 additional offense levels on top of the defendant's fraud guidelines. PSR ¶¶ 185, 201. But without the fraud conduct providing the initial high base offense level, the defendant's guidelines based on the violent conduct alone would have yielded a sentencing range between 3 to 4 years lower than the range provided for in the Final PSR.

imprisonment, which is the same sentencing range as proposed by the parties in the written plea agreement. PSR ¶¶ 246-47.

## IV.    <u>VICTIM RESTITUTION</u>

As outlined above, James LaForte's fraudulent conduct caused Par Funding's investors to lose approximately $2,488,645 in principal, which also serves as his restitution amount. PSR ¶ 258. The defendant has stipulated to paying this restitution amount in his written plea agreement. PSR ¶ 23.

## V.    <u>SENTENCING ANALYSIS</u>

### A.    <u>Overview</u>

Defendant Jimmy LaForte, a repeat felon, stands before this Court having brutally attacked an unarmed officer of the court, from behind, in broad daylight and in retaliation for the lawyer's legal efforts to hold the LaForte family responsible for committing one of the largest financial frauds in Philadelphia history. This attack was not a crime of passion or a chance encounter gone wrong. Rather, the defendant stalked and assaulted G.A. outside his Center City law office with the premeditated assistance and advice of his brother, Joseph LaForte. This attack was also not an isolated incident. The defendant repeatedly used threats of violence to both terrorize his family's perceived adversaries and to extort payments from delinquent Par Funding borrowers, all after already being convicted for prior felonies involving similar conduct.

It is beyond question that the defendant deserves a lengthy term of imprisonment not only to punish him for his many crimes and to bring justice to his victims, but also to send a strong message to the public that the LaForte brothers' brand of brazen and violent lawbreaking will not be tolerated and will be punished severely.

The government believes that the most appropriate sentence is 137 months' imprisonment, which is the very top of the parties' proposed "C plea" range (and the advisory guidelines range) of 110 to 137 months. A sentence of over 11 years' imprisonment is appropriately lengthy, and it will ensure that LaForte (who is 48 and has health issues) remains in prison until he is nearly 60. In short, the proposed sentence meets the goals of sentencing set forth in Section 3553(a) without being greater than necessary to achieve those ends.

### B.    Legal Standard

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or

vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

C.    **Consideration of the Section 3553(a) Factors**

1.    The Nature and Circumstances of the Offenses

Jimmy LaForte's crimes fall into three major categories. First, the defendant defrauded Par Funding's investors of approximately $2.48 million when he unlawfully diverted their money into his own accounts through a series of sham MCA contracts and unwarranted commissions. Second, the defendant extorted payments from Par Funding MCA customers, often through horrific and personal threats of violence. And third, the defendant obstructed justice and committed retaliation at his brother's behest when he assaulted an esteemed member of the Philadelphia legal community in a brutal but cowardly come-from-behind attack, and then threatened the government's witnesses with additional violence a few days later. Even after factoring in the defendant's role as the violent bagman carrying out his brother's dirty work, the nature and circumstances of these wide-ranging offenses unquestionably support the significant 137-month sentence sought by the government.

2.    The History and Characteristics of the Defendant

Jimmy LaForte's latest convictions cap a twenty-year crime spree that began with him and his family (including his brother Joseph LaForte and their parents) defrauding dozens of homeowners in Long Island, New York out of millions of dollars in and around 2004. PSR

¶ 208. Between 2004 and 2006, the defendant was also involved in extending personal high-interest loans which he collected through force and threats of violence, and he directed a co-conspirator to commit retaliatory arson, which resulted in federal convictions for extortion and racketeering. PSR ¶ 209. While incarcerated in state prison, the defendant turned to operating a sports betting operation, which resulted in a conviction for illegal gambling. PSR ¶ 210. After being released from his third prison sentence in 2015, the defendant started working with his brother for the Par Funding criminal enterprise as a finder of new merchants and enforcer up until the SEC's intervention in July 2020.[10]

Much like his older brother, the defendant appears to have had no constructive presence in his community, engaged in no charitable or volunteer work, held no sustained legitimate employment, and made no attempts to otherwise share any portion of his ill-gotten wealth with the public on which he preyed. Nor does there appear to be any motivation for his crimes beyond greed and serving as a loyal attack dog for his brother. In short, there is little positive to be said about LaForte's personal history or characteristics.

As this Court is already well-aware, the defendant has encountered significant health issues over the past year while incarcerated. This included considerable weight loss, jaundice, a week-long hospitalization in September 2024, and a diagnosis of acute pancreatitis which has warranted regular follow-up care by the FDC health staff and outside health consultants. PSR ¶¶

---

[10]    According to a federal indictment in the Eastern District of New York, following Par Funding's placement in Receivership, the defendant entered into another racketeering conspiracy as a member of (and soldier for) the Gambino organized crime family of La Cosa Nostra ("LCN"), where the defendant allegedly extorted and harmed victims on behalf of the LCN and unlawfully possessed a firearm. PSR ¶ 210. Those charges remain pending and unresolved.

228-30. The defendant's serious and ongoing health and physical ailments are relevant to his sentencing as a potential mitigating factor. PSR ¶¶ 261.

The government's proposed 137-month sentence will take the defendant out of the community until he is nearly sixty, and when combined with his health issues, upon release the defendant will be much less able to carry out the same types of violent crimes he committed previously. Although the government does not expect the defendant will somehow emerge from prison as a changed man, it does believe that the proposed sentence will be effective in deterring him from committing further criminal conduct.

3.    The Seriousness of the Offense, Respect for the Law, and Just Punishment

A term of imprisonment is required to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2). Jimmy LaForte has been convicted of a number of serious and grave offenses, including an assault against an officer of the court, and the proposed 137-month sentence will meet these important objectives.

4.    Deterrence and Consistency in Sentencing

Although Jimmy LaForte's criminal history suggests that he may be beyond redemption at this stage in his life, the government maintains that specific deterrence remains an important factor here. Of even greater importance is the interest of general deterrence, as the message must be clear that any individual who would commit violence against a member of our legal community for doing their work will be prosecuted and sentenced to a significant term of incarceration.

5.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants
with Similar Records who Have Been Found Guilty of Similar Conduct

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).

In addition to being guided by the Sentencing Guidelines range of 110 to 137 months, the Court should consider each defendant's role in the charged racketeering conspiracy. Co-defendant Joseph LaForte was unquestionably the leader of this conspiracy, the most culpable defendant in this case, and fully deserving of the 15.5 years' imprisonment requested by the government. The defendant should receive the second-highest sentence in this case. Although he played a relatively minor role in Par Funding's securities and wire fraud scheme that duped investors, Jimmy LaForte served as one of his brother's primary enforcers and used threats and actual violence to ensure his family always came out on top, and his tactics unquestionably took a very real financial, mental, and physical toll on his victims.

While this case presents an unusual combination of factors, the proposed sentence of 137-months—which is a top of the guidelines sentence—is sufficiently and appropriately weighty while also not creating a sentencing disparity.

18

      6.     <u>Other Considerations</u>

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

## V.    __CONCLUSION__

In sum, all of the appropriate considerations of sentencing favor the imposition of a sentence of 11 years' and 5 months' imprisonment, which is the top of the parties' (and the advisory guidelines') sentencing range. This sentence will serve the important goal of bringing justice and finality to James "Jimmy" LaForte's many and varied victims, and it is sufficient but not greater than necessary to achieve the other goals of the Sentencing Act.

              Respectfully submitted,

              NELSON S.T. THAYER, JR.
              Acting United States Attorney

              */s Samuel S. Dalke*
              SAMUEL S. DALKE
              MATTHEW T. NEWCOMER
              ERIC D. GILL
              Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the Government's Sentencing Memorandum was served by ECF notification and email on the defense counsel listed below:

Thomas S. Mirigliano, Esq.
Counsel for Defendant James LaForte

*/s Samuel S. Dalke*
Samuel S. Dalke
Assistant United States Attorney

Date:   March 3, 2025